1  John L. Smaha, Esq.        Bar No. 95855
   Gustavo E. Bravo, Esq. Bar No. 218752
2  **SMAHA LAW GROUP**
   7860 Mission Center Court, Suite 100
3  San Diego, California 92108
   Telephone:    (619) 688-1557
4  Facsimile:    (619) 688-1558

5  Attorneys for Debtor, Sargent Ranch, LLC

6

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **SOUTHERN DISTRICT OF CALIFORNIA**

10  In re                          | CASE NO. 10-00046-PB11

11  SARGENT RANCH, LLC,            | Chapter 11

12

13                     Debtor.     | **DEBTOR'S FIRST AMENDED
                                     DISCLOSURE STATEMENT**
14                                 | **PURSUANT TO SECTION 1125 OF
                                     THE BANKRUPTCY CODE WITH**
15                                 | **RESPECT TO DEBTOR'S PLAN OF
                                     REORGANIZATION (REDLINED)**
16

17

18

19

20

21  W:\Sargent Ranch\Plan and D.S\Caption (Discl Stmnt).wpd

22

23

24

25

26

27

28

---

**DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE
BANKRUPTCY CODE WITH RESPECT TO DEBTOR'S PLAN OF REORGANIZATION (REDLINED)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

In re:                                              *

SARGENT RANCH, LLC                    *        Case No. 10-00046-PB11
                                                         (Chapter 11)
                                                    *

        Debtor.
*     *     *     *     *     *            *     *     *     *     *

## DEBTOR'S <u>FIRST AMENDED</u> DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO DEBTOR'S PLAN OF REORGANIZATION

John L. Smaha, Esq., Bar No. 095855
SMAHA LAW GROUP, APC
7860 Mission Center Ct., Ste. 100
San Diego, CA 92108
T: (619) 688-1557
F: (619) 688-1558

*Attorneys for Sargent Ranch, LLC.*

## I. **INTRODUCTION**

Sargent Ranch, LLC ("Debtor"), debtor in possession in the above-referenced chapter 11 case (the "Reorganization Case"), submits this first amended disclosure statement (the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.,* the "Bankruptcy Code") with respect to the Debtor's Plan Of Reorganization filed concurrently herewith (the "Plan"). This Disclosure Statement is to be used in connection with the solicitation of acceptances of the Plan. A copy of the Plan is attached hereto as *Exhibit 1.* Unless otherwise defined herein, terms used herein have the meanings ascribed thereto in the Plan *(see* Section 1 of the Plan entitled "Definitions and Interpretation").

Attached, or to be filed as exhibits to this Disclosure Statement, are the following documents:

- The Plan (Exhibit 1)
- Liquidation Analysis *(*Exhibit 2*)*
- Financial Operating Projections (Exhibit 3)
- List of Creditors by Class and Claim Amounts.  Amounts listed are subject to objection (Exhibit 4).
- Agreement entered into between Watley and Debtor (Exhibit 5).
- Court's Order Approving the Employment of Watley (Exhibit 6).
- Color-Coded Map of the Debtor's Properties (Exhibit 7).
- Terrasearch's letters of July 8, 2008 and June 17, 2009 (Exhibit 8).
- Granite Construction Material's core drilling samples performed and obtained in June of 2007 (Exhibit 9)
- Declaration of Verne Freeman (Exhibit 10)
- Report Issued by Live Oak Associates, Inc. on July 23, 2009 (Exhibit 11).
- Second Report Issued by Live Oak Associates, Inc., dated November 21, 2007 (Exhibit 12).
- Declaration of Dr. Rick Hopkins (Exhibit 13).
- Report Prepared by the California Department of Conservation (Exhibit 14)
- Declaration of Stan Ellis of Ellis Energy (Exhibit 15)

1

- Opinion Letter Drafted by the Firm of Morrison & Forrester confirming the subdivision and development opportunities available on the Debtor's Properties (Exhibit 16).

- Debtor's Business Plan (Exhibit 17).

- Watley Group's Description of all efforts undertaken by the Watley Group to identify potential investors for the Debtor, etc. (Exhibit 18).

- Note and Security Agreement with Equity Investment Properties, Inc. (Exhibit 19).

If you are entitled to vote to accept or reject the Plan, the ballot ("Ballot") for acceptance or rejection of the Plan is enclosed with this Disclosure Statement.

After the Effective Date of the Plan, the Reorganized Debtor will conduct business, including the development of various projects on the Sargent Ranch properties. Under the Plan, the Debtor will remain in full control of the Reorganized Debtor. Thus, current trade and business creditors of the Debtor will have the opportunity to continue to conduct business with the Reorganized Debtor.

The Plan also contemplates a distribution to holders of Allowed General Unsecured Claims. Each holder of an Allowed General Unsecured Claim (Class 6) will receive on account of such claim, its pro rata share of periodic distributions from the Disbursement Account maintained by the Distribution Agent.

Initially, the Debtor shall issue a promissory note and deed of trust secured by a second lien position on the Sargent Ranch Property to the Liquidating Trust as explained herein and in Debtor's Plan. Such note and deed of trust shall be in a second position subject only to the Priming Financing in an amount not to exceed $20,000,000. The promissory note shall initially be issued in the amount of $165,000,000 subject to adjustment once all claims have been determined by either the automatic settlement, Lender Litigation or otherwise. The promissory note will require an initial payment of $1,550,000 and semi annual periodic distributions from the Operating Distributions Funds. As funds are received, disbursements shall be made on the promissory to the creditors by the Distribution Agent . As more fully discussed below the Debtor projects a distribution of 100% of Allowed General Unsecured Claims. The Plan implements the Debtor's restructuring and restart of its business as a sustainable and viable business.

2

## II. **NOTICE TO HOLDERS OF CLAIMS**

The purpose of this Disclosure Statement is to enable you, as a creditor whose claim is impaired under the Plan, to make an informed decision in exercising your right to vote to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

On _____, the United States Bankruptcy Court for the Southern District of California (the "Bankruptcy Court") entered an order approving this Disclosure Statement as containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable investor typical of the solicited classes of claims against the Debtor to make an informed judgment with respect to the acceptance or rejection of the Plan.

**APPROVAL OF THIS (OR ANY OTHER) DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

Each holder of a claim entitled to vote to accept or reject the Plan should read this Disclosure Statement, the Plan, and all accompanying documents in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to a Court-approved Disclosure Statement. No person or entity is authorized to use or promulgate any information concerning the Debtor or its business or the Plan, other than information contained in a Court-approved Disclosure Statement. You should not rely on any information relating to the Debtor, its business or the Plan other than that contained in the Court-approved Disclosure Statement, the proposed Plan and in accompanying exhibits.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and return the same to John L. Smaha, Esq., Smaha Law Group, 7860 Mission Center Court, Ste. 100, San Diego, CA, 92108, no later than 4:00 p.m., Pacific Time, on _____(the "Voting Deadline"). You will be bound by the Plan if it is accepted by the requisite holders of claims, even if you do not vote to accept the Plan.

3

TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED NO LATER THAN 4:00 P.M., PACIFIC TIME ON _____. For a general description of the voting instructions and the name, address and phone number of the person you may contact if you have questions regarding the voting procedures, *see* Section X "Confirmation and Consummation Procedures-Solicitation of Votes" below.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") on _____, Pacific Time, in the United States Bankruptcy Court, Southern District of California, located at 325 West F Street, San Diego, California 92101.

The Bankruptcy Court has directed that Objections, if any, to confirmation of the Plan be filed on or before _____, Pacific Time, in the manner described in Section X "Confirmation and Consummation Procedure" below.

**THE DEBTOR BELIEVES THAT THE PLAN MAXIMIZES CREDITOR RECOVERIES AND URGES ALL HOLDERS OF IMPAIRED CLAIMS TO VOTE TO ACCEPT THE PLAN.**

### III. EXPLANATION OF CHAPTER 11

**A.       Overview of Chapter 11**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11, a debtor attempts to reorganize its business for the benefit of the debtor, its creditors and other parties in interest. The Debtor commenced its Reorganization Case with the Bankruptcy Court by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on January 4, 2010.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor as of the date the petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. In the present Reorganization Case, the Debtor has remained in possession of its property and continues to manage its financial affairs as a debtor-in-possession, with the court approved assistance of the Watley Group.

4

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts to collect or recover pre-petition claims from the debtor or to otherwise interfere with, or exercise control over, the debtor's property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying claims against and interests in the debtor. Unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case.

## B.    Plan of Reorganization

Although referred to as a plan of reorganization, a plan may provide for anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation, the plan becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan.

After a plan of reorganization has been filed, the holders of impaired claims against and interests in a debtor are permitted to vote to accept or reject the plan, provided such holders are to receive distributions under the plan. Before soliciting acceptances to the proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of Claims against the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtor's solicitation of votes on the Plan.

If all classes of claims and interests accept a plan of reorganization, the bankruptcy court may confirm the plan if it independently determines that the requirements of section 1129 of the Bankruptcy Code have been satisfied. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests" of creditors test and be "feasible."

5

The "best interests" test generally requires that the value of the consideration to be distributed under a plan to the holders of claims or interests in the debtor is not less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization. With the possible exception of approval of the Plan by all impaired classes, the Debtor believes that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code including, in particular, the best interests of creditors test and the feasibility requirement.

Chapter 11 does not require that each holder of a claim or interest in a particular class vote in favor of a plan of reorganization in order for the bankruptcy court to determine that the class has accepted the plan. Rather, a particular class will be determined to have accepted the plan if the court determines that the plan has been accepted by a majority in number and two-thirds in amount of those claims actually voting in such class. In the present case, only the holders of claims who actually vote will be counted as either accepting or rejecting the Plan.

In addition, classes of claims or interests in the debtor that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class or because of applicable law, a class is deemed to have rejected the Plan. A class is "impaired" if any of the legal, equitable, or contractual rights associated with the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity or payment in full in cash on the effective date of the plan.

6

As more fully discussed below, holders of claims in Class 1(Settling Secured Creditors), Class 2 (Secured Claims of Old First Deed of Trust Holders), Class 3 (Secured Claims of Old Second Deed of Trust Holders), Class 4 (Secured Claims of Old Third Deed of Trust Holders),. Class 6 (General Unsecured Claims), class 7 (Subordinated General Unsecured Claims) are entitled to vote on the Plan. Class 8 (Claims of Wayne F. Pierce) and Class 9 (Equity Interests) are deemed to have rejected the Plan. Class 5(a) (Unsecured Priority Tax Claims) and Class 5(b) Priority Claims are unimpaired and do not vote under the Plan.

The Bankruptcy Court may also confirm a plan of reorganization even though fewer than all classes of impaired claims and equity interests accept it. For a plan of reorganization to be confirmed despite its rejection by a class of impaired claims or equity interests, the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, in an amount equal to the allowed amount of such claim or such other treatment as accepted by the holder of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interests in such class.

## IV. HISTORY & OVERVIEW OF THE DEBTOR

### A.    Pre-Petition Activities & Factors Leading to Bankruptcy

Sargent Ranch, LLC was created in, or about, May of 2000. The purpose for Debtor's creation was to take title to various real properties located in the County of Santa Clara, State of California and further described as Assessor Parcel Numbers: 841-36-010, 810-38-002, 810-38-009, 810-38-014, 810-38-015, 810-38-016, 810-38-017, 810-37-006, 810-37-007, 810-37-008, along with any and all lot line adjustments thereof (the "Debtor's Properties"). The Debtor's Properties were obtained through the efforts of Wayne F. Pierce, who had obtained an option to purchase the Debtor's Properties from certain third parties including Fivestar Commerce, Inc. and WFP Financial, Inc.

Debtor obtained financing from First Blackhawk Financial Corporation ("Blackhawk") a full service mortgage company that gathered a number of "investors" in order to fund the loans made to Sargent. By recording of three separate notes and deeds of trust, Blackhawk loaned a total of $43,000,000 to Sargent. The loans were funded in four separate installments in the following general order:

| | | |
|---|---|---|
| 1. | First Deed of Trust (June, 2000) | $15,000,000.00 |
| 2. | Second Deed of Trust (Nov. 2000) | $15,000,000.00[1] |
| 3. | First Deed of Trust Modification (Nov., 2000) | $10,000,000.00 |
| 4. | Third Deed of Trust (Oct. 2003) | $ 3,000,000.00 |

In fact, in addition to the $43,000,000 in original loans, Blackhawk arranged additional protective advances which raised the total loans to as much as $47,846,532.00 based on copies of bank statements previously held, controlled and managed by Blackhawk. These protective advances were used for project expenses and costs as per the direction of Blackhawk, without the direction of the Debtor or authority of the Debtor.

---

[1] In fact, this distribution to Sargent occurred over time, with Blackhawk first issuing the note and then selling portions of the note to its "investors" over a brief period of time.

The Debtor's Properties were initially obtained by Sargent with the goal of developing residential homes and ranches for sale with a golf course and several other commercial opportunities. However, as the market for residential construction and certain limitations to construction in Santa Clara became evident to Sargent, Sargent sought to expand the scope of potential projects on the Debtor's Properties and began efforts to expand the use of the Debtor's Properties for other purposes. Among these opportunities, was Sargent's efforts to have a tribe of native Americans obtain federal recognition of its tribe and to have a portion of, if not all, of the Debtor's Properties identified as sovereign property. Other opportunities were later identified, such as the potential to develop a sand quarry on a portion of the Debtor's Properties and the idea of developing a riparian credit bank for the sale of environmental credits to private and government entities. Sargent spent significant amounts of money to develop these opportunities and established potential projects that have exponentially multiplied the potential value, if not the actual value, of the Debtor's Properties from a purchase price of approximately $18,000,000 to as much as $700,000,000.

Although misleading allegations have been made by certain creditors, Sargent never controlled the funds loaned to it by Blackhawk and its "investors". It was Blackhawk's investors that insisted upon having Blackhawk control all loan funds, required that all funds be maintained by Blackhawk in their bank accounts and all releases to Debtor were made subject to the approval of Blackhawk. Debtor did not control the funds and could not direct those funds at its own discretion. Further, all funds paid to any and all parties, including Wayne F. Pierce were approved by Blackhawk. Any indication that Sargent misappropriated funds without Blackhawk's approval is completely unfounded.[2] Further, certain of Blackhawk's investors have gone so far as to make the ridiculous claim that the Debtor squandered the $47,846,532.00 that Blackhawk "lent" to Sargent. Sargent has reviewed bank records for Blackhawk's various "Sargent Ranch" bank accounts. This review has revealed that Blackhawk paid both pre-paid and other interest payments to these same "investors" in the amount of $14,678,076.14. Blackhawk itself received fees on these loans in the amount of

---

[2] It is important to note that Sargent had a contractual relationship with Blackhawk and had no relationship with Blackhawk's individual "investors" other than those contracts with Blackhawk.

$2,375,709.00. These amounts alone indicate that Sargent never even received almost seventeen million of the original forty-three million dollar loan. Further, the acquisition of the Debtor's Properties cost a total of $17,756,132.28, further payments for unpaid property taxes in the amount of $1,682,519.26 all went directly into the Debtor's Properties. After that, Blackhawk also "loaned" as much as $500,000.00 to its insiders, Griffin and Appleton. Finally, Blackhawk made protective advances, at its own direction, not at Debtor's request, to other entities known as Mare Island and Roddy Ranch in order to protect Blackhawk's interests in those projects in the total amount of $837,440.26. In all, Sargent never saw $37,829,876.94 of the initial loans. With the remaining $10,016,655.06, Debtor worked continuously towards the identification and development of the various raw material assets and potential projects that have left the Debtor's Properties with a potential value of over seven hundred million dollars.

**B.     Post-Petition Activities**

Since the filing of the bankruptcy, Debtor has faced staunch opposition to any of its efforts to reorganize, refinance or in any way make progress towards an effective bankruptcy. Debtor has sought and found avenues by which to develop the sand quarry site, having entered into a tentative agreement for Debtor to obtain the necessary permits to begin extraction of the valuable sand deposits on a portion of Debtor's Properties. This motion was met with objections from Burton Benson and other investors. Debtor also sought to sell a portion of the Subject Properties to an entity looking to develop a solar facility. This motion was also met with objections from Admiral Benson and other investors. Debtor then filed a motion to determine release prices on various portions of the Debtor's Properties in order to make the systematic and organized liquidation of the Debtor's Properties a possibility moving forward. Not surprisingly, that motion was also met with objections from Admiral Benson and other investors. Finally, Debtor filed a motion to employ the brokerage firm of Cassidy Turley, simply to find potential buyers for a portion, or the entirety, of the Subject Property. The employment of Cassidy Turley would not have resulted in any payment to Cassidy Turley until such time as a separate motion to approve any sale was filed, however, in line with Admiral Benson's strategy, that motion was also met with objections from Admiral Benson and other

investors.

It is clear to the Debtor that the select "investors" opposing every motion will not be satisfied unless they are the direct owners of the Debtor's Properties. Debtor will need to put its best foot forward to try and get a viable and feasible plan on file. As such, Debtor sought and obtained an order allowing the Debtor to employ the Watley Group, LLC ("Watley"). The agreement with Watley calls for Watley to assist the Debtor in the things that are most crucial to a reorganization at this point, obtaining Debtor-In-Possession Financing ("DIP Financing"), developing a strategy for Debtor's reorganization based on such DIP Financing and to assist the Debtor in drafting a feasible Plan. Attached as Exhibit 5 is a true and correct copy of the Agreement entered into between Watley and Debtor. Debtor could have sought a statement of position from the United States Trustee and attempted to get a court order by ex parte application as allowed by the Local Rules, but Debtor somehow anticipated that Admiral Benson and perhaps other "investors" would seek to stop this motion as well. Not surprisingly, Admiral Benson, through ERG has filed another opposition. Debtor also received an objection from the United States Trustee raising a number of concerns over the Watley Group's employment. Despite these anticipated objections, the Court was convinced that the Watley Agreement was a valid and necessary step towards reorganization and, with a number of changes to the Agreement, approved the Agreement by an order entered after hearing. Attached as Exhibit 6 is the Court's Order Approving the Employment of Watley.

## C.    Debtor's Real Properties and Its Various Assets

As shown in detail by a detailed land map provided by the Debtor, the Debtor's Properties cover 6,400 acres on a plot of land that stretches approximately five miles from east to west and reaches about three and a half miles from north to south (See Exhibit 7, a Color-Coded Map of the Debtor's Properties). This impressive mass of land is separated into fourteen distinct legal parcels. As is evident from the map, the Debtor's fourteen properties are further segmented into various potential and advancing projects that can and will be developed shortly. There are two separate plots that provide a source of liquid asphalt for extraction (marked in green on the color map). There is one large plot available for a sand extraction facility (marked

11

in blue on the color map). There are two plots that are available for installation of a solar facility (marked in red on the color map). There are no less than seven areas available for red legged frog and California tiger salamander environmental credits (marked in pink on the color map). There are two large areas available for residential property development, two additional areas available for industrial development and one area for commercial property development (Marked through the use of horizontal and diagonal lines on the color map). The vast array of different assets and available uses for the Debtor's Properties give the Debtor's bankruptcy a truly unique aspect.

Below is a more detailed description of the specific business projects being developed on the Debtor's Properties and the efforts undertaken by the Debtor to bring these projects closer to fruition.

**1.      Sand Extraction Quarry.**

A 25 million ton, sand quarry worth approximately $73 million upon permitting in approximately 2 years.

Business Objectives/Summary

a.      Invest $3.9 to $4.1 million to, permit, build and begin operating a 25 million ton facility to extract sand quarry on 100 acres of land on the Property and commence operations in 24 to 30 months.

b.      Achieve approximate annual operating cash flow of $5,400,000 after Year 1 of operations, $10,500,000 after Year 2 of operations and $16,100,000 after Year 3 of operations and average annual cash flow of $35,500,000 afterYears 4 through 10 of operations.

c.      Consider selling the quarry project to a third party at a value of over $70 million based on permits, resources in the ground, and operating projections.

Through the Debtor's extensive efforts, there now exists a proven and confirmed "in ground" asset of approximately 200,000,000 tons of construction grade sand and gravel. The Debtor is currently in the process of preparing for filing a use permit for the sand extraction facility that would work, over the next several years. The Debtor's confidence in this deposit is based on the results of two separate independent set of tests performed and verified by Terrasearch, Inc. and Granite Construction Materials. The findings of Terrasearch, Inc. are confirmed and communicated by Terrasearch's letters of July 8, 2008 and June 17,

12

2009. True and correct copies of these letters are attached as Exhibit 8 hereto. Granite Construction Material's findings are represented by several core drilling samples performed and obtained in June of 2007. True and correct copies of these drilling samples are attached as Exhibit 9 hereto.

These geologic investigations have verified that a large deposit of sand, and other deposits of gravel, exists on portions of the Santa Springs property, one of the fourteen legal parcels owned by the Debtor. The Santa Springs property, as the anticipated sand quarry/extraction facility is known, is located south of Gilroy, California. The investigations include multiple deep core borings and a series of 75 shallower pits dug with an excavator. Samples of sand recovered at various depths were tested for compliance with C 33 and Caltrans specifications for concrete sand and have met the requirements. Volumetric analysis conducted by TerraSearch, based on the borings and excavations has indicated the sand deposit to be approximately 200,000,000 tons (with an in ground value of $2 a ton, a total value of over $400,000,000) on 1,200 acres. A deposit of sand of this quantity and quality make the reserve a regionally significant geologic resource. The market for the sand will be largely to concrete manufacturers but sand is also used for a variety of construction related uses such as bedding materials, asphalt sand, and plaster and mortar sands. Sand is in short supply in the northern California market in general. The Santa Springs quarry would serve the entire Santa Clara County market, as well as nearby Monterey and San Benito counties. In some cases sands from the quarry may be able to be sold into San Mateo counties and farther for some specialty products. Sands are currently being imported into the Santa Clara County from neighboring counties as well as being shipped in from British Columbia. An existing rail spur near the proposed sand site will facilitate exporting the sand throughout the Northern California region.

In order to legally mine the sand on the current project site, a Use Permit from the County of Santa Clara must be obtained. Debtor is unaware of any legal reason why the Use Permit should not be granted by the County based upon the proper final designs of the quarry and the availability of any required mitigation already on site in the Debtor's Properties. The process for obtaining the Use Permit will necessarily include a CEQA review, public hearings before the Planning Commission and the Board of

Supervisors. The anticipated approval time for the Use Permit will likely be in the 12 to 18 month range and should cost between $1,000,000 and $1,500,000. The location of the proposed sand facility, with direct access to the US 101 and with no residential subdivision neighbors for miles, is a key aspect for the likelihood of its acceptance. A further key will be for the Debtor, and/or potential partners, to design a project layout with virtually no visual impacts, which can be done by using the existing terrain along with an approximate 1,500 lineal foot berm to shield the processing and customer loading area from view of the adjacent 101 Highway. Debtor has spent significant time meeting with potential design firms, funding partners and county officials and is uniquely prepared to proceed with this process when, and if, the creditors allow this to happen and available financing options are finalized.

In addition to the Use Permit from Santa Clara County, the Debtor will also likely have to obtain permits from other Federal and State agencies such the Army Corps of Engineers, the U.S. Fish and Wildlife and the California Department of Fish and Game. These other agencies will be primarily concerned with the project's impact to wetlands and biological resources. Preliminary biological investigations already done by the Debtor show little potential impacts to wetlands and/or endangered species. The Debtor has also conducted studies that have identified and have set aside various on site properties for mitigation easements for listed species. Discussions with Dr. Rick Hopkins of Live Oak Associates and Dave Johnston of the California Fish and Game have already developed a preliminary mitigation plan for the site.

The Declaration of Verne Freeman, president of Freeman Associates, is attached hereto in support of the general likelihood and potential of the potential sand quarry on the Debtor's Properties. Verne Freeman has over 16 years of experience in mine permitting and entitle projects. Mr. Freeman has visited the Debtor's Properties many times over the last fifteen years and is very familiar with the planned efforts to permit and operate a twenty-five million ton san quarry on approximately 100 acres of the Debtor's Properties. The Declaration of Verne Freeman is attached hereto as Exhibit 10.

14

2.     **Riparian and Wildlife Habitat Mitigation Credit Sales Business**.

The Federal Government encourages wildlife preservation and the prudent use of land and other natural resources through the Clean Water Act and the Endangered Species Act. It has therefore mandated that developers who destroy riparian/wetland or endangered species habitats in their development processes must offset their destruction in some way. The offset method preferred most by regulators is for developers to purchase mitigation "credits" from third parties who have preserved or restored such habitats. Surveys completed on the Property verify a substantial amount of Riparian and Endangered Species credits available beyond its own projected needs, which Management intends to sell to third parties who require these credits, including both private and public entities.

The Debtor's Properties contain within them many acres of land that are available for Habitat Mitigation for various forms of California wildlife. The Debtor has obtained the necessary reports studies and surveys to establish 804 acres of land that can be set aside for Riparian Habitat, 500 Acres for Red-Legged Frog Habitat and 500 acres for California Tiger Salamander Habitat. Again, this is not a blind assumption by the Debtor. Attached as Exhibit 11 hereto is a true and correct copy of a report issued by Live Oak Associates, Inc. on July 23, 2009, which discusses two things. First, the fact that the property anticipated to become the sand extraction facility/quarry has no riparian and/or wildlife habitats that need to be protected. Second, it also acknowledges the existence of the frog and salamander habitats that occur naturally throughout Sargent Ranch. The second report, dated November 7, 2007, and attached hereto as Exhibit 12, confirms the identification of the Riparian Credit Habitat Mitigation for more than eight hundred acres.

The large habitats that have been identified and act as "habitat credits" available to offset other land that would be developed is of great value to the Debtor. First, it can and will support the construction of the sand facility/quarry discussed in detail above. Second, the Debtor can and will sell the additional lands as mitigation credits for other businesses and/or developments. In Exhibit 11, Live Oak Associates, Inc. values the riparian habitat acreage alone at a potential value of $120,000,000 to $180,900,000. The sale of these

15

mitigation credits does not require any "development" and it does not require any additional "work" on the Debtor's Properties. The development of this business would depend more on the hiring of staff to sell the credits and develop a methodology for maintaining the properties sold as "protected' environments. The Debtor believes the total value of these business assets could and should be in excess of $200,000,000.

Dr. Hopkins of Live Oak Associates has provided the Debtor with an updated declaration in support of the development of the wildlife mitigation credits and the potential to develop the Debtor's Properties for the business of selling those credits. Dr. Hopkins is the founder and principal for Live Oak Associates and has vast experience in the area of environmental rights and governmental requirements. Attached as Exhibit 13 is a true and correct copy of Dr. Hopkins's declaration.

The Debtor has already received interest from the Santa Clara Valley Water District to purchase 52 red-legged frog credits, which could yield the Company in excess of $2.6 million based on Santa Clara County value estimates of similar habitat credits.

Based on Debtor's research, including the amount ($81,400 per credit) that Santa Clara County expects to pay for similar habitat credits (see the Santa Clara County Habitat Conservation Plan: Mitigation Measure 3.3.5a), Management believes that the unfinished Frog Habitat and Salamander Habitat credits could be valued at a "discounted", or "wholesale", price of $20,000 per credit.

Frog and Salamander Habitat credits also increase in value when "finished." Management's research and conclusion on the value of these credits are partly based on a key report, the Economic Analysis of Critical Habitat Designation for the California Red-Legged Frog. This report, prepared in 2009 by Industrial Economics, Inc and Berkeley Economic Consulting for the U.S. Fish and Wildlife Service, concluded that finished Red-Legged Frog credits are worth an average of $50,000 each. Management believes that the finished Salamander Habitat credits will be worth a similar amount each.

16

### 3.    Liquid Asphalt.

In various portions of the Debtor's Properties, the Debtor has identified a naturally occurring asset known as liquid asphalt.  There are estimated asphalt deposit of 74,000 to 370,000 tons that have been identified but are subject to further evaluation to determine market values and potential cash flow to the Company. The Debtor worked with the state of California Department of Oil and Gas to verify the quality of the liquid asphalt that can be used as a petroleum based product for sale to construction material business companies and in the creation of pavement.  Attached as Exhibit 14 hereto is a true and correct copy of a report prepared by the California Department of Conservation that verifies the existence and the quality of the naturally occurring liquid asphalt on the properties.   The report is based on surveys conducted by the state in the year 2,000.  The report discusses the overall status of the Sargent oil field or Tar Creek as it is identified in the report.  In addition, to the liquid asphalt, the report indicates further potential deposits of oil and gas sources that could also be taken from the Debtor's Properties.   This is an asset that is identified not from Debtor's opinion, or facts based upon Debtor's own, self-serving analysis of its property.  The asset is based on a report done by the state of California, perhaps with the assistance and consent of the Debtor, a third party disinterested in the Debtor's real properties.   The extraction of the liquid asphalt alone could generate as much as $10,000,000.

The Debtor currently lacks sufficient data to determine the entire size and scope of this opportunity and intends to engage experts to further evaluate and develop an implementation plan.  However, it has received information from tests conducted by Ellis Energy indicating that the quality of the liquid asphalt materials is very good and is useful for a variety of products. These products include use as:  binding material for asphaltic concrete (primary use), component of asphaltic concrete patching material, and component of roofing patching material.

17

While the Debtor must complete further investigations to confirm the magnitude of this Opportunity, it did previously engage Ruggeri, Jensen, Azar & Associates ("RJA"), a Northern California-based engineering firm (www.rja-gps.com) to evaluate the potential quantity of this Opportunity. As a result of these efforts it was provided algorithms by RJA and excavation information from Giacolone Construction that has led management to estimate that the Property contains 7,453 tons of asphalt per acre on an estimated 10 to 50 acres. If these parameters can be proven out by systematic further investigation, then the total amount of available asphalt is would be between 74,530 to 372,650 tons. Liquid Asphalt for paving is an especially valuable product. Over the last year, the California Department of Transportation's Paving Asphalt Price Index has ranged between $330 and $435 per ton.

The Debtor requires further testing and production costing to determine the level of profitability that it could obtain from this opportunity. Accordingly, no revenue is assumed in projections from this source pending these further investigations. However, if the parameters of this opportunity are confirmed, the Debtor believes that commencing asphalt extraction operations is relatively simple and straightforward process and could start in the second half of 2011 and produce cash flow in 2012. Attached as Exhibit 15 is a true and correct copy of a letter authored by Stan Ellis of Ellis Energy. Mr. Ellis has recently conducted a tour of the Debtor's Properties and has confirmed the existence of the liquid asphalt and the various uses that a company such as Ellis Energy may have for this product. To realize revenues from this Resource, the Debtor must first secure a grading permit. The Debtor's advisors believe this permit can be obtained in several months' time at a cost of approximately $300,000. The actual extraction process requires only the contracting of mobile extraction and processing vehicles that can come onto the property with minimal preparation of the site. Alternatively, the raw material could be trucked off site and processed nearby.

4.      **Oil & Gas Royalty Leases**

Royalty stream valued between $450,000 and $620,000. There are three leases covering oil and gas rights on the Property. First, there is an existing "legacy" oil and gas royalty lease, signed in about 1970. This lease covers 320 acres of the Debtor's Properties and is owned by Patriot Resources, LLC ("Patriot") of

Santa Barbara, CA. The Company does not receive oil or gas royalties related to this lease because the royalty was prepaid in full. Patriot has been producing oil at the rate of 25,000 barrels per year on this property. When production increases, the Debtor will begin receiving payments from the "legacy" lease again.

In October 2007, the Debtor entered into two additional oil and gas royalty leases with Patriot: 6.25% of gross profit on any hydrocarbons on the 320 acres adjacent to the area covered by the legacy lease described above, and 4.167% of the gross profit from any hydrocarbons extracted on the remaining 5,360 acres of the property.

Annual production under the legacy lease above is anticipated by Patriot to eventually be between 25,000-100,000 barrels per year, indicating $100,000 to $400,000 per year in cash flow to owners of the Property based on a $75 price per WTI barrel (The average forward price for October 2010 through January 2012 on the NYMEX exchange is $79.94 per WTI barrel. Source: CME Group, 9/17/10). Royalty income is anticipated to begin by mid-2011 contingent upon new production wells being completed by Patriot and emergence from bankruptcy. The low and high values ascribed to this resource were calculated using a 20% and 15% discount rate, respectively. The lease described above on the remaining acreage on the Property is not expected to produce significant quantities of hydrocarbons.

### 5.    Solar Facility.

The Debtor controls approximately one hundred and twenty (120) acres that have been identified as being a prime site for a solar energy facility. The creation of this potential business asset has come about for several reasons, the most important of which are changes in State and Federal subsidy laws for the creation of renewable energy facilities. The Debtor has been analyzing these changes and is working with third parties to maximize the value of this opportunity. The parcel identified by the Debtor and third parties enjoys the benefit of direct access to the existing power grid via high wire transmission lines already traversing the chosen site. In order to proceed, the Debtor will need to work closely with state and federal agencies and will likely require additional capital to obtain the necessary permits and licenses to continue.

19

The development of facilities for solar and wind energy generation are allowed by permit on the Debtor's Properties. These facilities are expected to play an important role in the long-term development of the Debtor's Properties. Debtor feels positively about the future contribution of solar in particular since there is a 120-acre parcel on the east side of the 101 freeway that is an ideal site for solar installations and also contains high wire transmission line towers for direct access to the local power grid at low cost. This represents an important advantage for the Debtor as construction of high tension wire transmission lines costs approximately $1 million per mile.

The Debtor plans to use part of the proceeds of the financing to further investigate the timing, costs and benefits of both solar and wind energy facilities.

### 6.    Commercial/Industrial/Residential Zoning Available.

In addition to the various, proven business projects proceeding on the Debtor's Properties, the Debtor has maintained the right to develop large tracts of its real properties for commercial, residential, industrial and institutional construction and use.  As set forth in detail in a report prepared by Morrison & Forrester, the general plan and zoning for the Santa Clara County portion of the Debtor's Properties allows for low to medium intensity construction for various uses.  Exhibit 16 hereto, is a true and correct copy of the opinion letter drafted by the firm of Morrison & Forrester confirming the subdivision and development opportunities available on the Debtor's Properties.  The opinion letter includes eight separate Certificates of Compliance that show that several portions of the Debtor's Properties are currently ready for development with no further requirements needed from Santa Clara County.  These Certificates are extremely valuable to the Debtor and would allow for immediate construction.

The Debtor anticipates that it could partner with construction companies to complete these build outs or sell portions of the real properties subdivided into various lot sizes.  With the difficulties that the construction industry has had in recent times not just in California, but worldwide, the Debtor acknowledges that projects relating to actual real estate development may be delayed for the time being and, in fact, it may be in the best interest of the Debtor and its creditors to hold off on development of residential, commercial

and/or industrial projects until such a time as a healthier market is available for such property. However, the value of the available zoning and general plan compliance certificates is still a valuable asset of the estate and should not be ignored. Even the property currently identified as the sand and gravel extraction facility and quarry would have post extraction value as zoning for additional residential and industrial lots.

Debtor believes that real estate development represents the long term greatest value for Sargent Ranch. However, while the Debtor's Properties are clearly in the path of development, Debtor is currently unable to make an accurate prediction of the timing or values that it may receive. Debtor intends to use a portion of the Use of Proceeds to develop a long-term master plan for the entirety of Debtor's Properties that can maximize its long term value. The Debtor understands that implementing this master plan may extend to 15 to 30 years (or even more) into the future.

> 7.    **Water Rights and Treatment Facility for Children of the U.S. Military Parents**

The Debtor believes the potential uses for the Debtor's 6,400 acres of real property have yet to be exhausted. There are various other potential sites and projects that could be developed on the available land. Two of these have already been identified. The Debtor has identified a number of overland, river and spring water sources that could be sold as Water Rights. The estimated value of this opportunity alone could be in excess of $1,500,000. Another anticipated use for some of the land available to the Debtor is for the development of a facility for the children of military personnel suffering from the effects of post-traumatic stress disorders. In addition to addressing a critical need facing our country today, such a facility would increase the overall standing of the Sargent Ranch are and generate goodwill with the surrounding community and governmental entities.

## V. OVERVIEW OF THE PLAN

**A.**    **General**

As provided in some detail above, Debtor holds a significant long-term, multi-business, opportunity based on its ownership of the Debtor's Properties. The Debtor's Properties are located 5 miles south of downtown Gilroy, CA an agricultural and residential community located about 20 miles south of San Jose and 30 miles north of Monterey, CA. The eastern boundary of the Debtor's Properties has over 3 miles of

frontage along State Highway 101 with existing dedicated north and southbound access, while the west portion of the Debtor's Properties benefits from dedicated access to State Highway 129.  In addition to excellent highway access, Debtor has direct rail access via an existing rail spur to the Union Pacific Railroad. The 5,200 acres of the Debtor's Properties in Santa Clara County have approved and recorded "Certificates of Compliance" from the Santa Clara County Board of Supervisors certifying that the Debtor's Properties are in compliance with the State of California Subdivision Maps Act, as well as the current Santa Clara Zoning and General Plans. The certificates allow for a wide variety of low density commercial, industrial, residential and retail uses.

**B.**    **Business Overview**

The Debtor believes the value of the Debtor's Properties can be dramatically increased by investing in several natural resource opportunities to reach positive cash flow as quickly as possible. While today the Debtor's Properties are raw land, once permitted to develop the vast natural opportunities on the property, and once the business is cash flow positive, the value of the land is increased dramatically by the value of the business. Valued without permits, only for agricultural use, in a forced liquidation, Creditors have taken the position that the land is only worth approximately $5,000 per acre and only 5,000 acres are habitable (the remainder being too mountainous) resulting in a projected total value of $25 million in a forced liquidation. However, the Debtor and The Watley Group estimate the value of Sargent Ranch increases dramatically in less than three years from the forced liquidation value of $25 million up to a value of the the land plus the value of the sand and aggregate businesses ($75 million) Total value is thus increased to $100 million ($25 million plus $75 million) after spending less than $20 million to build the businesses on the Sargent Ranch Property.  This does not include the value of other opportunities such as residential, industrial and commercial real estate development, solar power development, as well as environmental mitigation credits that might be sold.    The day to day management of the Debtor is being done under an approved employment agreement with The Watley Group, LLC.  It plans to implement a phased "step-by-step" approach to the development of the Debtor's Properties. The short-term highest and best use and value of

Debtor is the development of the sand, aggregate and liquid asphalt businesses and sales of environmental mitigation credits. Longer-term, management will continue to evaluate other opportunities such as solar and wind power, as well as various real estate development opportunities. However, the value of real estate development cannot be estimated due to the uncertain economic outlook.

There are currently seven separate business opportunities on the Debtor's Properties that the Company plans to evaluate and implement when and as they are economically attractive. All seven are allowed under the current County of Santa Clara General Plan and Zoning Ordinances. These seven business opportunities are described in detail above. Following are the necessary actions that Debtor would perform for each of these business opportunities under the Debtor's Plan.

1. **Action Steps for Debtor on Sand Extraction/Quarry**:

    a. Retain Freeman Associates ("Freeman") to advise and assist in securing a use permit at a cost of $15,000 per month and a performance based success fee of up to $500,000 when the permit is obtained. Freeman Associates ("Freeman"), is an entitlement and project management firm based in Palo Alto widely recognized as one of the best in the industry and especially in Northern California. http://www.vfreeman-associates.com/

    b. Engage an engineering/project manager specialized in this type of development at total cost of approximately $400,000 over the two year permitting and pre-production period. The Company has been in discussions with Tetra Tech, Inc. a large publicly held geotechnical engineering firm to provide confirmation of this Resource and engineering work to support gaining operating permits. www.tetratech.com

    c. Conduct biological, traffic, civil engineering, and environmental studies in support of the permit application at a cost of $300,000. These cost estimates are based on estimates from Freeman.

    d. Build required roads and infrastructure (including supplying water and power to the quarry) at a cost of $500,000 to $750,000.

    e. Have an environmental impact report performed under the auspices of the County of Santa Clara Planning Department and a reclamation plan developed by a sub-contractor of Freeman for an estimated total of $650,000.

    f. Post a reclamation bond of $437,500 in cash.

    g. Other costs and a 5% contingency amount to $750,000.

2. **Action Steps/Objectives for Riparian and Habitat Mitigation Credit Sales:**

    a.    Retain a specialized consulting firm immediately upon funding (Live Oak Associates-see below) to further evaluate this Opportunity and establish and execute a marketing plan for these credits.

    b.    This evaluation would determine what credits can be sold and which credits should be retained so that Sargent Ranch can execute its long term plan.

    c.    Sell approximately 377 credits during 2011 through 2017 and yield total revenue of $23,646,000 during this time period.

    d.    Sargent Ranch enjoys a wide variety of natural rivers, streams, wetlands, trees and grasslands environments. These lands create numerous acres of habitats for various wildlife and large and small vegetation.

3. **Objectives/Action Steps:**

    a.    Retain qualified expert consulting and potential joint venture firms (including Ellis Energy Investments, Inc. www.ellisenergyinvestments.com) to determine quality and extent of deposits, costs of extraction, and potential economic benefits to the Company.

    b.    Evaluation period to be completed in six months from funding.

    c.    If evaluation is positive, execute joint venture or other funding approaches to obtain permits and commence operations.

    d.    Achieve cash flow from this Resource by 1st quarter of 2012.

A more specific and detailed business plan is attached hereto as Exhibit 17 hereto and the Debtor encourages all creditors to review Exhibit 17, and all exhibits attached hereto, carefully to receive a full description of Debtor's business plan..

## C.    Debtor-In-Possession Financing

In order to fund the Debtor's business operations described and detailed in the Business Overview above, Debtor intends to obtain, in one or more series of priming loans, priming financing in an amount between $3,000,000 and $20,000,000, but not to exceed $20,000,000 in total, which either by final order of the Bankruptcy Court or the Confirmation of the Plan of Reorganization is secured by a priming first deed of trust on the Debtor's Properties subordinate only to liens for real property taxes and easements, covenants and restrictions of record.

Debtor intends to use up to $20,000,000 from the Priming Financing to fund its operations until it is cash flow positive in 2013 (for the purpose of financial modeling, it is assumed that operations expenditures begin in January 2011). However, Debtor's projections currently only forecast a need for

24

$10,353,000.  See Exhibit 3, the Debtor's Financial Operating Projections.  The excess capacity will allow the Debtor to pay for any unexpected regulatory expenses, capital expenditures, or other costs that are necessary to being producing cash flow from any of its business opportunities.

Detailed projections are set forth in Exhibit 3, attached hereto.  It should be reviewed for particulars. In summary, however, it appears that based on such summary the following amounts are projected to be distributed to creditors under the Plan:

| | |
|---|---|
| Year 1 - | $1,550,000 |
| Year 2 - | $0 |
| Year 3 - | $372,700 |
| Year 4 - | $5,374,500 |
| Year 5 - | $9,563,700 |
| Year 6 - | $12,694,500 |
| Year 7 - | $15,911,000 |
| Total - | $45,466,300 |

Therefore, unsecured creditors should expect payments in full during the year 2017 at the latest.

1.      **Watley's Efforts to Obtain Primary Financing**

Attached as Exhibit 18 hereto is the Watley Group's description of all efforts undertaken by the Watley Group to identify potential investors for the Debtor, the Watley Group's contacts with potential investors, offers received by the Watley Group for the Watley Group and the methodology by which the Debtor and the Watley Group identified the best source of Priming Financing for the Debtor.

2.      **Source of Priming Financing**

Subject to the Court's approval, the Debtor has selected the provider of the Priming Financing from several competitive offers.   The Priming Financing will come from Equity Investment Properties, Inc.  The terms and conditions of the Note and Security Agreement are attached hereto as Exhibit 19.

Equity Investment Properties, Inc. shall obtain a 30% equity interest in the Reorganized Debtor as a result of the first $7,500,000 financing. Equity Investment Properties, Inc.'s ownership interest shall increase by one percent (1%) for every additional $750,000.00 Equity Investment Properties, Inc. provides in Priming Financing up to a total of 40% ownership for $15,000,000.00 in Priming Financing. The ownership interest of Equity Investment Properties, Inc. is best described by the following schedule:

| Total Amount EIPI Lends to the Debtor | Total EIPI Equity Ownership in the Reorganized Debtor |
|---|---|
| Up to $7,500,000.00 | 30% |
| $7,500,001 to $8,250,000 | 31% |
| $8,250,001 to $9,000,000 | 32% |
| $9,000,001 to $9,750,000 | 33% |
| $9,750,001 to $10,500,000 | 34% |
| $10,500,001 to $11,250,000 | 35% |
| $11,250,001 to $12,000,000 | 36% |
| $12,000,001 to $12,750,000 | 37% |
| $12,750,001 to $13,500,000 | 38% |
| $13,500,001 to $14,250,000 | 39% |
| $14,250,001 to $15,000,000 | 40% |
| Over $15,000,000 | 40% |

**D.**    <u>Summary of Classification and Treatment Under the Plan</u>

The following table provides a summary of the classification and treatment under the Plan of all Claims and Equity Interests and is intended to highlight information contained elsewhere in this Disclosure Statement. The summary is qualified in its entirety by the more detailed information in the Plan, the pro forma information appearing elsewhere in this Disclosure Statement, and the other documents referenced herein. The Administrative Expense Claims, Fee Claims, Priority Claims and Priority Tax Claims shown below constitute the Debtor's estimate of the amount of such Claims to be paid in Cash by the Plan Trust on the Effective Date, taking into account amounts paid or projected to be paid prior to that date.

The total amount of the classified Claims shown below reflects the Debtor's current estimate, based upon the Debtor's schedules, books and records, and the informed opinion of the Debtor's financial advisors and other professionals of the likely amount of such Claims after the resolution by settlement or litigation of Claims that the Debtor believes are subject to disallowance or reduction. However, because no assurances can be provided regarding the amount of Claims that will ultimately be disallowed or reduced, and because numerous Claims have been filed that exceed the amounts reflected for such Claims in the Debtor's schedules, distributions under the Plan to certain classes of Claims may differ substantially from the projected ultimate recoveries reflected below. Reference should be made to the entire Disclosure Statement and to the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

| Class 1 | Impaired |
|---------|----------|

| Secured Claims | Class 1 claimants shall receive periodic distributions as a result of an automatic settlement as to their claims in the Lender Litigation. All creditors in Class 1 will receive the same treatment. ~~Initially, the amount of the Class 1 creditors claims will be determined by taking the gross amount of money lent by the creditor to the Debtor and subtracting therefrom any interest, including any prepaid interest, paid back to such creditor, and then multiplying this amount by 1.35. By way of example: original debt = $1,000,000, Prepaid Interest = $250,000, and calculation of claim = ($1,000,000 - $250,000) x 1.35 = $1,015,500.00.~~ The Class 1 claim of each claimant shall be the principle amount invested by each claimant. |
|---|---|
| Settling Secured Creditor Liquidating Trust. This class consists of all Settling Secured Creditor Liquidated Trust Claimants. This Class is impaired. | |
| | The claims in this class shall be paid semi annually without interest by the Distribution Agent from the Operating Distribution Funds on or before February 28th and August 30th of each year of the Plan until the earlier of the promissory note having been paid in full or seven years after the Effective Date of the Plan. In addition to the payments called for herein above, the ~~class 1 claimants will also receive payments equal to 10% of distributions made to the Class 8 Equity Security Holders for a period equal to ten years from the Effective Date of the Plan~~Liquidating Trust shall be issued 25% of the ownership interest in the Reorganized Debtor for the benefit of the Class 1 Creditors. This interest shall remain in perpetuity. This ownership interest shall be classified as a non-voting and non-managerial membership. |
| | The Debtor and/or Reorganized Debtor shall seek an order of the Bankruptcy Court that would determine that the position of Class 1 creditors would be primed to the position of Class 2, 3 and 4 secured creditors due to the nature of the Class 1 claims as a settling class and as quasi-priming financing. |
| Total Estimated Allowed Claims | Unknown |
| | |
| Class 2 | Impaired |

| | |
|---|---|
| **Secured claim of Old First Deed of Trust Litigating Creditors** | The Allowed Amount of each Class 2 creditor shall be set by the Bankruptcy Court or as otherwise agreed to between the Debtor and such creditor subject to Bankruptcy Court approval.  After the payment in full of all Class 1 creditors, Class 2 creditors shall be paid in full along with interest thereon at the rate of 5% per annum commencing on the Effective Date of the Plan.  Such payments shall be paid Pro Rata semi-annually by the Distribution Agent from the Operating Distribution Fund on or before February 28 and August 30 of each year of the Plan.  <u>Prior to commencing payments of principal, Class 2 creditors shall receive interest only payments during the time period that Class 1 creditors are receiving payment.  Interest only payments shall be made on an annual basis commencing on the one year anniversary of the Effective Date of the Plan.</u>  The creditors in this class shall not retain their security interests in the Sargent Ranch Property.  Rather, their rights will be tied to the promissory note and deed of trust given to the Liquidating Trust as set forth ~~above~~<u>in the Plan</u>. |
| Total Estimated Allowed Claims | $21,094,564.85 |
| | |
| Class 3 | Impaired |

29

| Secured claim of Old Second Deed of Trust Litigating Creditors. | The Allowed Amount of each Class 3 creditor shall be set by the Bankruptcy Court or as otherwise agreed to between the Debtor and such creditor subject to Bankruptcy Court approval.  After the payment in full of all Class 1 and Class 2 creditors, Class 3 creditors shall be paid in full along with interest thereon at the rate of 5% per annum commencing on the Effective Date of the Plan.  Such payments shall be paid Pro Rata semi-annually by the Distribution Agent from the Operating Distribution Fund on or before February 28 and August 30 of each year of the Plan.  <u>Prior to commencing payments of principal, Class 2 creditors shall receive interest only payments during the time period that Class 1 creditors are receiving payment.  Interest only payments shall be made on an annual basis commencing on the one year anniversary of the Effective Date of the Plan.</u> The creditors in this class shall not retain their security interests in the Sargent Ranch Property.   Rather, their rights will be tied to the promissory note and deed of trust given to the Liquidating Trust as set forth ~~above~~<u>in the Plan</u>. |
|---|---|
| Total Estimated Allowed Claims | $17,948,201.12 |
| | |
| Class 4 | Impaired |

| | |
|---|---|
| **Secured claim of Old Third Deed of Trust Litigating Creditors.** | The Allowed Amount of each Class 4 creditor shall be set by the Bankruptcy Court or as otherwise agreed to between the Debtor and such creditor subject to Bankruptcy Court approval.  After the payment in full of all Class 1, Class 2 and Class 3 creditors, Class 4 creditors shall be paid in full along with interest thereon at the rate of 5% per annum commencing on the Effective Date of the Plan.  Such payments shall be paid Pro Rata semi-annually by the Distribution Agent from the Operating Distribution Fund on or before February 28 and August 30 of each year of the Plan.  <u>Prior to commencing payments of principal, Class 2 creditors shall receive interest only payments during the time period that Class 1 creditors are receiving payment.  Interest only payments shall be made on an annual basis commencing on the one year anniversary of the Effective Date of the Plan.</u> The creditors in this class shall not retain their security interests in the Sargent Ranch Property.   Rather, their rights will be tied to the promissory note and deed of trust given to the Liquidating Trust as set forth ~~above.~~ <u>in the Plan</u> |
| Total Estimated Claims | $3,992,896.97 |
| | |
| **Class 5(a)** | Unimpaired |
| **Priority Tax Claims** | A holder of an Allowed Priority Tax Claim shall receive from the Disbursement Account, in full and complete settlement, satisfaction and discharge of its Allowed Priority Tax Claim, Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim. |
| Total Estimated Allowed Claims | N/A |
| | |
| **Class 5(b)** | Unimpaired |

| | |
|---|---|
| **Priority Claims** | A holder of an Allowed Priority Claim shall receive from the Distribution Account, in full satisfaction of such Claim, Cash in an amount equal to such Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the first (1st) Business Day after the date that is thirty (30) calendar days after the date (a) such Priority Claim becomes Allowed.  Payments for this Class shall be paid from funds received from the Priming Financing. |
| Total Estimated Allowed Claims | N/A |
| | |
| **Class 6** | Impaired |
| **General Unsecured Claims** | The Allowed Amount of each Class 6 creditor shall be set by the Bankruptcy Court or as otherwise agreed to between the Debtor and such creditor subject to Bankruptcy Court approval.  After the payment in full of all Secured Claims above, Class 6 creditors shall be paid in full without interest.  Such payments shall be paid Pro Rata semi-annually by the Distribution Agent from the Operating Distribution Ffund on or before February 28 and August 30 of each year of the Plan. |
| Total Estimated Allowed Claims | N/A |
| | |
| **Class 7** | Impaired |
| **Subordinated Unsecured Claims** | The Allowed Amount of each Class 7 creditor shall be set by the Bankruptcy Court or as otherwise agreed to between the Debtor and such creditor subject to Bankruptcy Court approval.  After the payment in full of all Secured Claims and Class 6 claims above, Class 7 creditors shall be paid in full without interest.  Such payments shall be paid Pro Rata semi-annually by the Distribution Agent from the Operating Distribution Fund on or before February 28 and August 30 of each year of the Plan. |
| Total Estimated Allowed Claims | N/A |

| | |
|---|---|
| | |
| **Class 8** | Impaired |
| **Claims of Wayne F. Pierce** | Class 8 consists of the claims of Wayne F. Pierce. The Debtor listed $7,125,000 in accrued management fees for the period of 05/2000 to 01/2010 as being due to Wayne F. Pierce. The Debtor also listed in Schedule B loans to Wayne Pierce of $2,500,000. Under the Plan the claims of Wayne Pierce will be voluntarily waived by Mr. Pierce in exchange for a release by the Debtor of any and all claims that the Debtor could have against Mr. Pierce. As a result thereof, Wayne F. Pierce will not receive any distribution under the Plan on account of his unsecured claim. The Order of Confirmation will constitute a release of the Debtor's claims against Mr. Pierce of every kind and nature. ~~The Allowed Amount of each Class 8 creditor shall be set by the Bankruptcy Court or as otherwise agreed to between the Debtor and such creditor subject to Bankruptcy Court approval. After the payment in full of all Secured Claims, Class 6 and Class 7 Claims above, Class 8 creditors shall be paid in full. Such payments shall be paid Pro Rata semi-annually by the Distribution Agent from the Operating Distribution fund on or before February 28 and August 30 of each year of the Plan. In the event that the Class 8 creditors have not been paid in full within seven years of the Effective Date of the Plan, the Class 8 creditors may exercise any and all rights and remedies available to them under applicable law.~~ |
| Total Estimated Allowed Claims | $2,500,000.00 |
| | |
| **Class 9** | Impaired |

| **Old Equity Interests** | Class 9 consists of the current equity ownership interest of the Debtor.  The records indicates that the Debtor is owned by Wayne F. Pierce (70%), Arthur I. Appleton, Jr. (15%), and Gregory F. Griffin (15%).  The interests of Arthur I. Appleton, Jr and Gregory F. Griffin are being challenged as part of the Lender Litigation.  ~~To the extent that any such challenge is successful, that interest shall revert to Wayne F. Pierce subject to dilution as indicated herein.~~ As of the Effective Date of the Plan and subject to the legal challenge as referenced above ~~and subject to dilution as provided below,~~ the ~~holders of the~~<u>Old</u> Equity Interests shall ~~retain 100% of the Reorganized Debtor.  There shall also be reserved for dilution up to 50% of the Reorganized Debtor with up to 10% being reserved to the Liquidating Trust as provided above and up to 40% to the lender providing Priming Financing.~~<u>be eliminated in their entirety.</u> |
|---|---|
| Total Estimated Allowed Claims | N/A |
|  |  |
| <u>Class 10</u> | <u>Impaired</u> |

34

| | |
|---|---|
| **New Equity Interests** | Class 10 consists of the equity ownership interest of the Reorganized Debtor. The Reorganized Debtor shall have three distinct ownership groups. The first shall be Equity Investment Properties, Inc., the source of the Priming Financing. Equity Investment Properties, Inc. shall obtain a 30% equity interest in the Reorganized Debtor as a result of the first $7,500,000 financing. Equity Investment Properties, Inc.'s ownership interest shall increase by one percent (1%) for every additional $750,000.00 Equity Investment Properties, Inc. provides in Priming Financing up to a total of 40% ownership for $15,000,000.00 in Priming Financing. The second group holding New Equity Interests in the Reorganized Debtor shall be Settling Secured Creditor Liquidating Trust Claimants (Class 1). This group, consisting of all lenders that held a security interest in the Debtor by and through the three distinct deeds of trust and will have settled with the Debtor, shall hold a 25% equity interest in the Reorganized Debtor. The group's equity interest shall maintain an economic interest in the Reorganized Debtor and its retained earnings, but it will be in a separate and distinct class from any and all other equity interest holders in the Reorganized Debtor. The group will have no voting interest in the operations and management of the Reorganized Debtor. This group may increase its ownership up to 35% if the Reorganized Debtor cannot pay off all secured claims within the time period of this Plan as set forth in Section 4.8 below. The third tranche of New Equity Interest in the Reorganized Debtor shall be held by Wayne F. Pierce, or his designee. Wayne F. Pierce shall receive an initial 45% ownership interest in the Reorganized Debtor. The 45% interest shall be subject to reduction up to a minimum ownership interest of 25% depending on whether Equity Investment Properties, Inc. increases its Priming Financing amounts as set forth above and whether the old secured interest holders increase their equity interest as provide in Section 4.8 below. The entirety of the equity interest of Wayne F. Pierce in the Reorganized Debtor shall be held in trust by the Liquidating Trustee. The Liquidating Trustee shall retain this equity interest, along with any and all distributions made based upon this equity interest, in trust for Wayne F. Pierce until such time as all creditors are paid in full as provided for by the Plan. |

1.   **Unclassified Claims Against the Debtor**

| Administrative Claims | Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment (and except to the extent provided in sections 2.1 or 2.2 of this Plan), the Debtor shall pay to each holder of an Allowed Administrative Expense Claim Cash from the Distribution Account, in an amount equal to such Claim on the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable.  Such claims shall be paid from amounts reserved for in the Priming Financing. All fees payable pursuant to 28 U.S.C. § 1930(a)(6) shall be paid by the Debtor on or before the Effective Date. Upon the disposition of any property (including real or personal property) of the Debtor, the Bankruptcy Court, upon application of the Debtor, may determine the amount of any tax claim accruing as a result of the disposition of said property pursuant to section 503(b)(1)(B) of the Bankruptcy Code. |
|---|---|
| Total Estimated Allowed Claims: | $500,000 |

A list of all potential claims and estimated amounts are attached hereto for Creditor reference.

2.   **Plan Distributions to Classes of Creditors**

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

Except as specifically provided herein, at the option of the Plan Trust, any Cash payment to be made hereunder may be made by check or wire transfer, or as otherwise required or provided in applicable agreements.

All unclaimed Plan Distributions shall revert to the Plan Trust.

HOLDERS OF IMPAIRED CLAIMS SHOULD CAREFULLY READ AND CONSIDER THE PLAN AND THIS DISCLOSURE STATEMENT. THE DEBTOR URGES HOLDERS OF IMPAIRED CLAIMS TO VOTE TO ACCEPT THE PLAN.

## VI. THE CHAPTER 11 CASE

On January 4, 2010 (the "Petition Date"), Debtor filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of California.  Since the Petition Date, Debtor has remained in possession of its property and continues to manage its financial affairs as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**A.    Significant Post-Bankruptcy Events.**

**1.    Case Administration and Claims Against the Debtor**

On January 19, 2010 , the Debtor filed its schedules of assets and liabilities (the "Schedules"). In the aggregate, the Debtor scheduled secured claims totaling approximately $71,056,421.70 and unsecured (general and priority) claims totaling approximately $11,458,888.00.  These schedules have been amended on several occasions since the case was filed.

In addition to Claims scheduled by the Debtor, numerous proofs of claim have been filed against the Debtor. By notice dated February 25, 2010, the Bankruptcy Court fixed April 9, 2010 as the deadline to file all proofs of claim in the Reorganization Case. The Debtor currently is reviewing all of the filed claims as well as the Schedules to determine if further objections should be filed with respect to any of the proofs of claim.

The Debtor obtained approval from the Bankruptcy Court for the retention of professionals pursuant to section 327 of the Bankruptcy Code. The Debtor retained, among others, the following professionals: (a) the law firm of Smaha Law Group as general bankruptcy counsel representing the Debtor; (b) the Watley Group as a financing and management firm; and, (c) Affeld Grivakes Zucker, LLP, as special litigation counsel.

## 2.    Litigation Claim

On September 27, 2010, Sargent Ranch LLC, instituted the Lender Litigation against all of the secured creditors holding fractionalized interests in three deeds of trust that are recorded against the Sargent Ranch Property. The complaint, seeks violations of real estate multi lender laws (Business and Professions Code Section 10238(f)(1)); violations of securities laws (Corporations Code Section 25501.5); violations of Civil Code Section 1671; equitable subordination under Section 510 of the United States Bankruptcy Code; breach of implied covenant of good faith and fair dealing; breach of fiduciary duty; breach of contract and fraud. The basic premise of the litigation is to accomplish a number of facets. One is to determine the legality and the validity of the fractionalized deeds of trust. Secondly, the complaint seeks to determine the amounts that are actually owed to secured creditors under the Plan of Reorganization. For example, some lenders have asserted that the balance owed to all lenders exceed $165,000,000. Because it is the belief of the Debtor that the loans that were made to Sargent Ranch LLC violated applicable law, a judicial determination is requested that the claims of the various secured creditors be treated more like they were equity of the Debtor as opposed to true lenders. Therefore, equitable subordination is sought under Section 510 of the Bankruptcy Code for this purpose. Notwithstanding the foregoing, as set forth below, the Debtor has proposed a simple settlement for any creditor wishing to avail itself of the same, or by default under the Plan of Reorganization.

In order to implement the Lender Litigation, the Debtor filed for and had approved the Application to Employ Affeld Grivakes Zucker, LLP. The Application to Employ Special Litigation Counsel was to provide two forms of services to the Debtor: First, to bring the Lender Litigation lawsuit against the various lenders and other responsible parties. Secondly, they were retained for the purposes of bringing a separate action potentially against David Wallace and any other responsible parties, for among other things, breach of a non-circumvention agreement and fraud. The Disclosure Statement discusses in detail each of these pieces of litigation. It should be noted that Affeld Grivakes Zucker, LLP has agreed to a modification of their

regular hourly rates and have asserted a success fee as stated in their application. In the Lender Litigation, they are entitled to a reduced hourly rate of $295 per hour, plus a fee equal to 1% of the reductions achieved during the first 6 months after the filing of the complaint and 5% for reductions achieved thereafter, reducing the claims of creditors from $165,000,000 to the eventual figure contemplated by the Plan. The success fee, however, is capped at $1,500,000. With respect to the claim against David Wallace, et al. the matter is being done on an contingency basis with the firm receiving 33% of the total amount recovered if the matter resolves by settlement prior to 30 days of the date initially set for trial and 40% if the matter resolves by settlement, judgment or award within 30 days of the date initially set for trial.

In filing the Lender Litigation, the Debtor was mindful of the fact that many of the investors that put up money for these loans utilized funds from pension funds or other savings that were necessary for their living expenses or retirement. In fact, the vast majority of the investors had no culpable knowledge of what was transpiring with respect to their loans. Therefore, the Debtor has set forth a simple settlement program for creditors wishing to be part of the plan. The treatment of such creditors are provided in Class 1 of the Plan. ~~Essentially, except to the extent that the Debtor specifically excludes a particular creditor because of their individual culpability, which the Debtor may do so in its sole and absolute discretion by giving written notice of the same at the time ballots are solicited for voting on the Plan, a~~All secured creditors subject to the Lender Litigation will automatically be eligible to participate in Class 1 of the Plan. Class 1 of the Plan is anticipated to pay to such creditors the full amount of their claim calculated on a modified basis. The settled claim will be determined by taking the gross amount lent by the lender and subtracting from such amount any interest or prepaid interest that was received by the lender. This amount will be multiplied by 1.35. The product will become the new amount owed to such creditor under the Plan. In addition thereto, bonus compensation equal to 10% of the amount paid to Equity Security Holders over a 10 year period commencing with the Effective Date of Plan will also be paid to these creditors. Therefore, it is possible that the returns that are received by these creditors will be greater than the calculated amount of their claim. In order to participate under the Plan, a creditor will have the ability to accept the Plan or simply default in the litigation. In either event if the Plan is confirmed, creditor's claims will be paid as set forth above ahead of

secured creditors continuing with litigation. Future monitoring and ultimate remedies for the payment of these claims will be done by an independent Liquidating Trustee.

## VII. SUMMARY OF THE PLAN

As a result of the chapter 11 process and through the Plan, Debtor expects that creditors will obtain a substantially greater recovery from the estate than the recovery that would be available if the Assets had been liquidated under chapter 7 of the Bankruptcy Code. The Plan is annexed hereto as *Exhibit 1* and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by the more detailed provisions set forth in the Plan.

### A.      Classification and Treatment of Claims & Equity Interests

If the Plan is confirmed by the Bankruptcy Court, each holder of an Allowed Claim in a particular class will receive the same treatment as the other holders in the same class of Claims, whether or not such holder voted to accept the Plan. Moreover, upon confirmation, the Plan will be binding on all of the Debtor's creditors and stockholders whether or not such creditors or stockholders voted to accept the Plan. Such treatment will be in full satisfaction, release and discharge of and in exchange for such holder's respective Claims, except as otherwise provided in the Plan. Creditors are advised that, to the extent that their claims are not in a class that will receive payment, in full, on the Effective Date, that the present value of funds received under the Plan is less than the aggregate amount of the payments received over time, under the Plan. This maxim recognizes that a dollar received one year from today is worth less than a dollar received today. In performing a present value analysis, creditors should consult their financial advisor for a determination of an appropriate discount rate.

#### 1.      Unclassified Claims

The Bankruptcy Code does not require classification of certain claims against a debtor. In this case, these unclassified claims comprise Administrative Claims, including Fee Claims.

##### a.      Administrative Claims.

An Administrative Claim is any cost or expense of administration of the Reorganization Case incurred by the Debtor (or its Estate) on or after the Petition Date and before the Effective Date, and which is entitled to and allowed priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code (exclusive of Fee Claims, which are classified separately) and the actual and necessary costs and expenses of preserving the Estate and operating the Debtor's business during the Reorganization Case.

Under the Plan, Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment (and except to the extent provided in sections 2.1 or 2.2 of this Plan), the Debtor shall pay to each holder of an Allowed Administrative Expense Claim Cash from the Distribution Account, in an amount equal to such Claim on the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable. Such claims shall be paid from amounts reserved for in the Priming Financing. All fees payable pursuant to 28 U.S.C. § 1930(a)(6) shall be paid by the Debtor on or before the Effective Date. Upon the disposition of any property (including real or personal property) of the Debtor, the Bankruptcy Court, upon application of the Debtor, may determine the amount of any tax claim accruing as a result of the disposition of said property pursuant to section 503(b)(1)(B) of the Bankruptcy Code.

### b. Fee Claims.

All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by a date that is no later than the date that is forty-five (45) calendar days after the Effective Date and (b) shall be paid by the Plan Trust on behalf of the Debtor, in full from the Disbursement Account, in such amounts as are approved by the Bankruptcy Court (a) upon the later of (i) the Effective Date and (ii) ten (10) calendar days after the date upon which the order relating to the allowance of any such Fee Claim is entered or (b) upon such other terms as may be mutually agreed upon between the holder of such Fee Claim and the Plan Trust.

### B. Implementation of Plan

### 1.    Property Overview

Debtor holds a significant long-term, multi-business, opportunity based on its ownership of the Sargent Ranch Property. The Sargent Ranch Property is located 5 miles south of downtown Gilroy, CA an agricultural and residential community located about 20 miles south of San Jose and 30 miles north of Monterey, CA. The eastern boundary of the Sargent Ranch Property has over 3 miles of frontage along State Highway 101 with existing dedicated north and southbound access, while the west portion of the Sargent Ranch Property benefits from dedicated access to State Highway 129. In addition to excellent highway access, Debtor has direct rail access via an existing rail spur to the Union Pacific Railroad. The 5,200 acres of the Sargent Ranch Property in Santa Clara County have approved and recorded "Certificates of Compliance" from the Santa Clara County Board of Supervisors certifying that the Sargent Ranch Property is in compliance with the State of California Subdivision Maps Act, as well as the current Santa Clara Zoning and General Plans. The certificates allow for a wide variety of low density commercial, industrial, residential and retail uses.

### 2.    Business Overview

The Debtor believes the value of the Sargent Ranch Property can be dramatically increased by investing in several natural resource opportunities to reach positive cash flow as quickly as possible. While today the Sargent Ranch Property is raw land, once permitted to develop the vast natural opportunities on the property, and once the business is cash flow positive, the value of the land is increased dramatically by the value of the business. Valued without permits, only for agricultural use, in a forced liquidation, Creditors have taken the position that the land is only worth approximately $5,000 per acre and only 5,000 acres are habitable (the remainder being too mountainous) resulting in a projected total value of $25 million in a forced liquidation. However, the Debtor and The Watley Group estimate the value of Sargent Ranch increases dramatically in less than three years from the forced liquidation value of $25 million up to a value of the the land plus the value of the sand and aggregate businesses ($75 million) Total value is thus increased to $100 million ($25 million plus $75 million) after spending less than $20 million to build the businesses on the Sargent Ranch Property. This does not include the value of other opportunities such as residential, industrial

and commercial real estate development, solar power development, as well as environmental mitigation credits that might be sold.

The day to day management of the Debtor is being done under an approved employment agreement with The Watley Group, LLC. It plans to implement a phased "step-by-step" approach to the development of the Sargent Ranch Property. The short-term highest and best use and value of Debtor is the development of the sand, aggregate and liquid asphalt businesses and sales of environmental mitigation credits. Longer-term, management will continue to evaluate other opportunities such as solar and wind power, as well as various real estate development opportunities. However, the value of real estate development cannot be estimated due to the uncertain economic outlook.

There are currently seven separate business opportunities on the Sargent Ranch Property that the Company plans to evaluate and implement when and as they are economically attractive. All seven are allowed under the current County of Santa Clara General Plan and Zoning Ordinances. These seven business opportunities are described in complete detail above,

### 3.    Use of Proceeds

Debtor intends to use up to $20,000,000 from the Priming Financing to fund its operations until it is cash flow positive in 2013 (for the purpose of financial modeling, it is assumed that operations expenditures begin in January 2011). However, Debtor's projections currently only forecast a need for $10,353,000. The excess capacity will allow the Debtor to pay for any unexpected regulatory expenses, capital expenditures, or other costs that are necessary to being producing cash flow from any of its business opportunities.

### 4.    Payment to Creditors

Based on Debtor's projections, the following amounts are projected to be distributed to creditors under the Plan:

| | |
|---|---|
| Year 1 - | $1,550,000 |
| Year 2 - | $0 |
| Year 3 - | $372,700 |
| Year 4 - | $5,374,500 |
| Year 5 - | $9,563,700 |

Year 6 -          $12,694,500
Year 7 -          $15,911,000

Total -           $45,466,300

Therefore, unsecured creditors should expect payments in full during the year 2017 at the latest.

### 5.    Plan of Reorganization Spending

The Company will require up to $20 million in Priming Financing (less any amounts received by the Company in Debtor-in-Possession Financing pre confirmation) to develop the business to positive cash flow. This will provide a substantial increase in the value of the Reorganized Debtor.

### 6    Construction Materials Opportunity

The cash will be used to manage the estate and to obtain a Quarry Site Use Permit and all other permits required for the operation of a sand and aggregate quarry on the Sargent Ranch property in about 2 years. The permit process can be broken down into the following phases:

Phase 1 - Geologic Investigation

Phase 2 - Project Definition and Preparation of Preliminary Project Plans

Phase 3 – Early Consultation with Key Agencies and Officials

Phase 4 - Pre Submission Conferences and Formal Application for Permit

Phase 5 - EIR process

Phase 6 - Public Hearings – Santa Clara County

Phase 7 - Secondary Permits – SMG, ACOE, USFW, CDFG – Prep Submission Packages

Phase 8 – Other Permits, ACOE 404, USFW Section 7, CDFG 1600, SMARA- SBMG

Phase 9 - Site Work and Operation Start Up

The Watley Group has estimated the sand quarry operations would increase the value of the reorganized debtor by $70 to $75 million when the facility opens. The facility will also be used to evaluate the size and potential profitability of liquid asphalt business and the requirements to obtain the necessary permits for its operation. This portion of the Debtor's business could be operational in 2011 and produce cash flow in 2012.

The facility will also be used to evaluate solar, wind energy, and lease of water rights Opportunities. The Reorganized Debtor will also continue to monitor long term opportunities for the Property in residential, commercial and industrial real estate as these markets are expected to improve over the next five years. However, no income has been projected from the Opportunities described in this paragraph for the next five years. The Reorganized Debtor will also continue to monitor long-term opportunities for the Property in residential, commercial and industrial real estate as these markets are expected to improve over the next five years. However, no income has been projected from the Resources described in this paragraph for the next five years.

A detailed set of 24 month and five-year financial projections for the Company as a whole and for its individual Resources is included in the Disclosure Statement that accompanies this Plan. You should read it carefully to evaluate the risks associated with the Confirmation of any Plan of Reorganization.

### 7.    Post-Confirmation Funding and Operations

The implementation of the Plan of Reorganization requires Post Petition Priming Financing. Exhibit 18 attached hereto discusses at length the types of funding that the Debtor has been able to identify for this purpose and why such financing must be obtained on a priming loan basis. Exhibit 19 identifies the ability of the Debtor to obtain such financing and the terms and conditions that can be expected. The Post petition Priming Financing will be separately applied for and is subject to Bankruptcy Court approval. .

### 8.    Limitation of Liability

In exercising the rights and duties set forth in the Plan and Plan Trust Agreement, each Trustee shall exercise his best judgment so that the affairs of the Trust shall be properly managed and that interests of all the Beneficiaries are safeguarded but no Trustee shall incur any responsibility or liability by reason of any

45

error of law or of any matter or thing done or suffered or omitted to be done under the Plan Trust Agreement, except for willful misconduct, breaches of fiduciary duty, or negligence of such Trustee. No claim or cause of action shall lie against any Trustee for any action or lack of action taken by such Trustee in reasonable reliance upon the advice of any attorney or other professional engaged or consulted with.

### 9.    Default.

#### 9.1    Secured Creditors & Unsecured Creditors in Classes 1, 2, 3, 4, 6 and 7

A default will occur as to payment of Secured Creditors and/or Unsecured Creditors in Classes 1, 2, 3, 4, 6 and 7 if Debtor fails to make the required distributions to these creditors within ten days of the date due. In the event of any default, the Liquidating Trustee may take any action available to it under applicable state law for breach of contract provided that any such default continues after thirty (30) days notice to the Debtor and their counsel and the failure of the Debtor to cure any such default.

#### 9.2    Priority Claims, Including Priority Tax Claims

A default will occur as to payment of the Priority Claims (Classes 5(a) and 5(b)) if Debtor fails to make the required distributions to these creditors within ten days of the date due. In the event of any default, Class 5, Unsecured Priority Claimants may take any action available to them under applicable state law for breach of contract provided that any such default continues after thirty (30) days notice to the Debtor and their counsel and the failure of the Debtor to cure any such default.

### 10.    Time Bar to Payments

The Distribution Agent shall stop payment on any distribution check that has not cleared through the Disbursement Account within ninety (90) days of the date of issuance thereof. Requests for re-issuance of any such checks shall be made directly to the Distribution Agent by the holder of the Allowed Claim with

respect to which such check was issued. Any claim in respect of such voided check shall be made within one hundred and eighty (180) days after the date of the issuance of such voided check. If no claim is made as provided herein, all Claims in respect of voided checks shall be discharged and forever barred. The amount represented by such unclaimed checks, and those undeliverable, after commercially reasonable diligence, shall be distributed pro-rata to the remaining holders of Allowed Claims, pursuant to the terms of this Plan. Distributions to holders of Allowed Claims shall be made to their last known address, which shall be presumed to be as set forth on the proof of claim filed by such Claimant, or if no proof of claim was filed, on the Schedules filed by the Debtor, as may have been amended from time to time, unless a Claimant shall have supplied a new or corrected address in writing to the Distribution Agent within two weeks prior to a Distribution to permit the Distribution Agent to revise its records accordingly.

11.    **Exemption from Securities Laws**

The issuance of any securities, if any, pursuant to the Plan, shall be exempt from any securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code.

12.    **Special Tax Provisions**

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any notes or securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

C.      **The Plan Documents**

On the Effective Date the Debtor shall execute and deliver such documents as would be necessary to carry out the terms and conditions of the Plan.

D.      **The Reorganized Debtor**

1.      **Corporate Action**

The initial Board of Directors of the Reorganized Debtor shall consist of two members, Wayne F. Pierce and John Bryan. Subject to applicable law and any vacancy caused by death, disability or resignation, the initial Board of Directors of the Reorganized Debtor shall serve until the first annual meeting of the Reorganized Debtor. Thereafter, the Board of Directors of the Reorganized Debtor will be elected in accordance with the Articles of Organization and By-laws and applicable non-bankruptcy law.

On the Effective Date, the officers of the Reorganized Debtor shall be:

Wayne F. Pierce, Managing Member

John Bryan, Chief Executive Officer

Salaries shall be paid by the Reorganized Debtor as follows:

John Bryan: paid per terms of Court approved employment agreements.

Wayne F. Pierce: $250,000 annually, subject to adjustment.

As indicated in the Secured Note and the Security Agreement, Equity Investment Properties, Inc. has reserved the right to object to any and all salaries and expenses.

E.      **Compromise of Controversies**

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under this Plan, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to this Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtor. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in this Plan,

and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the estate, creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

## F.    Procedures for Disputed Claims

### 1.    Objections to Claims

Other than with respect to Fee Claims, only the Reorganized Debtor shall be entitled to object to Claims, including any Claim which has been listed by the Debtor in the Schedules in an amount not disputed or contingent. Any objections to such Claims (other than Fee Claims) shall be served and filed on or before the later of: (a) ninety (90) days after the Effective Date; (b) thirty (30) days after a request for payment or proof of Claim is properly filed and served upon the Debtor; or (c) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the Reorganized Debtor effects service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a claimant is unknown, by first class mail, postage prepaid, on the signatory of the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Reorganization Case (so long as such appearance has not been subsequently withdrawn). This Plan shall not affect any party's rights to object to Fee Claims.

### 2.    Payments and Distributions with Respect to Disputed Claims

To the extent a Claim is a Disputed Claim, the Distribution Agent shall not be required to make a distribution of the applicable disputed portion of a payment to the holder of such Disputed Claim which would otherwise be payable to the holder of a Disputed Claim. Instead such Disputed Claim shall be reserved for pending allowance or disallowance. In the event that the Disputed Claim is subsequently allowed, the Plan Trust shall thereafter pay the appropriate amount to the holder of the Claim in accordance with the terms of the Plan and in the same manner as any other creditor of the same Class.

### G.    Executory Contracts And Unexpired Leases

#### 1.    General Treatment

Subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which the Debtor is currently a party are hereby rejected; except for any executory contracts or unexpired leases that (i) have been assumed pursuant to Final Order of the Bankruptcy Court, (ii) are designated specifically or by category as a contract or lease to be assumed on an exhibit to the Plan, as such exhibit may be amended from time to time prior to the Effective Date to include additional or exclude pre-existing contracts and agreements, or (iii) are the subject of a separate motion to assume filed under section 365 of the Bankruptcy Code by the Debtor prior to the Effective Date.

#### 2.    Cure of Defaults

Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease to be assumed, the Debtor shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code, and consistent with the requirements of section 365 of the Bankruptcy Code, on or before thirty (30) days after the Effective Date, file and serve on parties to executory contracts or unexpired leases to be assumed and other parties in interest a pleading with the Bankruptcy Court listing the cure amounts of all executory contracts or unexpired leases to be assumed. The parties to such executory contracts or unexpired leases to be assumed by the Reorganized Debtor shall have fifteen (15) days from the date of service to object to the cure amounts listed by the Debtor. If an objection is filed with respect to the cure amount due under an executory contract or unexpired lease, the Bankruptcy Court shall hold a hearing to determine the cure amount. Notwithstanding section 8.1 or the foregoing, at all times through the date that is five (5) Business Days after the Bankruptcy Court enters an order resolving and fixing the amount of a disputed cure amount, the Debtor shall have the right to reject such executory contract or unexpired lease. Any cure amounts, determined pursuant to separate motion and order from the Bankruptcy Court, shall be paid by the Reorganized Debtor and shall not be an obligation of the Liquidating Trust.

3.    **Rejection Claims**

Except as otherwise ordered by the Bankruptcy Court, in the event that the rejection of an executory contract or unexpired lease by the Debtor pursuant to this Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor, unless a proof of claim has been filed with the Bankruptcy Court and served upon counsel for the Debtor on or before the Rejection Claims Bar Date. If there are no objections to the Rejection Claim, or to the extent the Rejection Claim later becomes an Allowed Claim, the Rejection Claim shall be classified and treated as provided in Sections 6 and 7 of the plan.

H.    **Conditions Precedent to the Effective Date**

1.    **Conditions Precedent to Confirmation**

Each of the following is a condition precedent to the occurrence of confirmation of this Plan:

(a)    the Bankruptcy Court shall have entered an order finding that the Disclosure    Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code; and

(b)    the Bankruptcy Court shall have entered a Confirmation Order.

(c)    the Debtor shall have obtained Court approval for the Priming Financing and such financing shall have funded in an amount necessary to carry out the terms and conditions hereof including the payment in full of administrative claims, Class 5(a) and 5(b) claims and the payment of $1,550,000 for distribution as provided herein.

2.    **Conditions Precedent to the Effective Date**

Each of the following is a condition precedent to the occurrence of the Effective Date.

1.    The Confirmation Order confirming this Plan, as such Plan may have been amended or modified, in form and substance satisfactory to the Debtor, shall have been entered and docketed by the Bankruptcy Court, and such order shall have become a Final Order and shall provide that:

(i)    the Debtor and Reorganized Debtor are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents contemplated by or described in this Plan;

(ii)    the provisions of the Confirmation Order are non-severable and mutually dependent;

(iii)    the Debtor shall be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125 and 1126 (b) of the Bankruptcy Code, and any non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation;

51

(iv)     the Debtor shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under this Plan and, therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under this Plan;

(v)     the plan documents, in form and substance acceptable to the Debtor shall have been executed and delivered by the Reorganized Debtor and such other parties deemed necessary by the Reorganized Debtor, and all conditions precedent thereto shall have been satisfied;

(vi)     the Reorganized Debtor shall have sufficient Cash on hand and/or financing sources to make timely distributions under this Plan;

(vii)     the Debtor shall file all notices and reports, if any, required to be filed, by the Debtor in connection with this Plan's effectiveness;

### 3.     <u>Waiver of Conditions Precedent</u>

Each of the conditions set forth in Section 9.1 of this Plan may be waived in whole or in party by the Debtor without any other notice to parties in interest or notice to or order of the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition may be asserted by the Debtor regardless of the circumstances that give rise to the failure of the condition to be satisfied. The failure of the Debtor or Reorganized Debtor to assert the non-satisfaction of any conditions will not be deemed a waiver of any other rights under this Plan, and each such right will be deemed an ongoing right that may be asserted or waived at any time or from time to time. If the Debtor waives any condition precedent and consummates the Plan, any challenge to the Debtor's waiver shall become moot by consummation of the Plan and will forever foreclose any ability to challenge the Plan.

### 4.     <u>Effect of Failure of Conditions</u>

If all the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than sixty (60) days after the Confirmation Date, or by such later date as is proposed and approved, after notice and a hearing, by the Bankruptcy Court, then upon motion by the Debtor made before the time that all of the conditions have been satisfied or duly

waived, the Confirmation Order shall be vacated by the Bankruptcy Court; *provided, however,* that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in section 9.1 of this Plan are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to this section 9.4, the Plan shall be null and void in all respects.

## I.    Effect Of Confirmation

### 1.    Vesting of Assets.

Subject to the terms of sections 11.2 and 11.3 of the Plan, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, except for leases and executory contracts that have not yet been assumed or rejected (which leases and contracts shall be deemed vested when and if assumed), all property of the estate shall vest in the Reorganized Debtor, free and clear of all Claims, liens, encumbrances, charges, and other interests, except as provided herein or in the Confirmation Order. The vesting shall specifically be free and clear of and interests provided in Exhibit 4 hereto.  The Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided herein.

### 2.    Discharges of Claims.

Except as otherwise provided herein or in the Confirmation Order, the rights afforded in this Plan and the payments and distributions to be made hereunder shall discharge all existing debts and Claims of any kind, nature, or description whatsoever against or in the Debtor or any of its Assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as otherwise provided herein, upon the Effective Date, all Claims against the Debtor and old equity interests in the Debtor shall be, and shall be deemed to be, discharged whether or not a proof of Claim or proof of interest was filed with respect thereto.

### 3.    Discharge of the Debtor.

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any kind or nature whatsoever against the Debtor or any of its assets

or properties, and regardless or whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor shall be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code. Upon the Effective Date, all holders of Claims shall be forever precluded and enjoined from prosecuting or asserting any such discharged Claim against the Debtor or the Reorganized Debtor.

      **4.**       **Terms of Injunctions or Stays.**

Unless otherwise provided herein, all injunctions or stays arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

      **5.**       **Injunction Against Interference With Plan**

Upon the entry of the Confirmation Order, all holders of Claims and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan.

      **6.**       **Injunction**

Except as otherwise provided in the Plan, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against the Debtor or the Estate are, with respect to any such Claims, permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the Reorganized Debtor or any of their property or any direct or indirect successor in interest to the Debtor or the Reorganized Debtor or any property of any such successor; (b) enforcing, levying, attaching (including, without limitation, any pre judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor or the Reorganized Debtor or any of their property or any direct or indirect successor in interest to the Debtor or the Reorganized Debtor or any property of any such successor; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor or the Reorganized Debtor or any of their property or any direct

or indirect successor in interest to the Debtor or the Reorganized Debtor or any property of any such successor; and (d) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan to the full extent permitted by applicable law.

7. **Retention of Causes of Action/Reservation of Rights**

(i)    Except as specifically provided herein, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights, Claims or Causes of Action that the Debtor may have or may choose to assert on behalf of the Estate in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Claims against any Person, to the extent such Person asserts a cross-claim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtor, the Reorganized Debtor, or any of their officers, directors, or representatives; (ii) the avoidance of any transfer by or obligation of the Estate or the Debtor or the recovery of the value of such transfer; (iii) the turnover of any property of the estate; and/or (iv) Claims against other third parties.

(ii)    Nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, Avoidance Action, right of setoff, or other legal or equitable defense that the Debtor had immediately prior to the Petition Date. The Reorganized Debtor shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, or other legal or equitable defenses which the Debtor had immediately prior to the Petition Date as fully as if the Reorganization Case had not been commenced.

**THE FAILURE TO SPECIFICALLY IDENTIFY ANY OTHER CAUSE OF ACTION OR AVOIDANCE ACTION SHALL NOT BE CONSTRUED OR ACT TO CREATE A WAIVER, RELEASE OR DISCHARGE OF SUCH CAUSE OF ACTION OR AVOIDANCE ACTION.**

8. **Exculpation**

None of the Debtor, the Reorganized Debtor, or any of their respective directors, officers, employees or members (acting in such capacity) shall have or incur any liability to any entity for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Reorganization Case, the

55

formulation, preparation, dissemination, implementation, confirmation or approval of the Plan, any other plan of reorganization or any compromises or settlements contained therein, any disclosure statement related thereto or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the transactions set forth in the Plan or in connection any other proposed plan; provided, however, that the foregoing provisions shall not affect the liability that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted breach of fiduciary duty, negligence or willful misconduct. Each of the foregoing parties in all respects shall have and shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities during the Reorganization Case and under the Plan.

### 9.    **Termination of Professionals and Official Unsecured Creditor's Committee.**

On the Effective Date, the engagement of each professional retained by the Debtor may be terminated without further order of the Court or act of the parties. The Debtor shall thereafter, without the need for further order of the Bankruptcy Court, be free to retain and compensate one or more professionals. Notwithstanding the foregoing, counsel to the Debtor will continue to have the right to be heard for their respective clients with respect to (a) any applications for allowance of Fee Claims and (b) any contested matters which are pending as of the Effective Date.   Notwithstanding the foregoing the Debtor intends on retaining the Smaha Law Group as post confirmation counsel and the Watley Group pursuant to its approved employment agreement.

### 10.    **Substantial Consummation**

On the Effective Date, upon the execution and delivery of the plan documents, the Debtor may seek an order from the Bankruptcy Court determining that, this Plan has been substantially consummated pursuant to section 1101 of the Bankruptcy Code. After such determination, administration of the Debtor's estate shall cease as to the operations of the Debtor and distributions to be made under the Plan.

11.    **U.S. Trustee Fees**

The Reorganized Debtor shall make all required quarterly reports to the Bankruptcy Court and to the Office of the United States Trustee. The Reorganized Debtor shall continue making all required quarterly payments to the United States Trustee until the Debtor obtains an order finding substantial consummation and allowing the Bankruptcy Court to administratively close the Reorganization Case. The Plan has all distributions made to creditors being made by the Distribution Agent to the beneficiaries of the Liquidating Trust as payments on the promissory note, as such, the Debtor anticipates that the Office of the United States Trustee shall only be entitled to the minimum quarterly payment until such time as an order finding substantial consummation has been entered by the Bankruptcy Court.

12.    **Plan Modifications, Amendments and Revocation**

Plan Modifications. This Plan may be amended, modified, or supplemented by the Debtor in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Claims or Old Equity Interests pursuant to this Plan, the Debtor may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of this Plan.

Other Amendments. Prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Old Equity Interests.

J.    **Retention of Jurisdiction**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157 (but this Plan shall in no way expand the jurisdiction otherwise granted to the Bankruptcy Court pursuant 28 U.S.C. §§ 1334 and 157), over all matters arising in, arising under, or related to the Reorganization Case for, among other things, the following purposes:

(a)    To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom.

(b)    To determine any motion, adversary proceeding, avoidance action, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date.

(c)    To ensure that distributions to holders of Allowed Claims are accomplished as provided herein.

(d)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim or Administrative Expense Claim.

(e)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated.

(f)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court.

(g)    To hear and determine any motion to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof.

(h)    To hear and determine all Fee Claims.

(i)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing.

(j)    To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release, injunction or exculpation provisions set forth herein, or to maintain the integrity of this Plan following consummation.

(k)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order.

58

(1)     To hear and determine matters concerning state, local, and federal regulations, Claims or taxes.

(m)     To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

(n)     To enter a final decree closing the Reorganization Case.

(o)     To recover all Assets of the Debtor and property of the estate, wherever located.

## K.     Plan Trust

### 1.     Creation of Plan Trust

On the Effective Date the Liquidating Trust shall be established for the purposes set forth in the Plan, including without limitation (A), to provide the Liquidating Trustee the power and authority to accept the promissory note and deed of trust on the Sargent Ranch Property and to exercise discretion over its collection and (B) for the purpose of distributing assets in accordance with Treasury Regulation Section 301.7701-4(d) and as a "grantor trust" for federal income tax purposes, pursuant to Sections 671 through 679 of the Tax Code.

### 2.     Grant of Promissory Note and Deed of Trust

In conformance herewith, the Debtor shall grant and record a promissory note and deed of trust in favor of the Liquidating Trust in the amount of $165,000,000 (subject to change as indicated above) and deliver the promissory note to the Liquidating Trustees as of the Effective Date in trust to be held for the benefit of the holders of Claims against the Debtor and to be applied as specified in this Plan, the Confirmation Order, the Plan Documents, and any other orders relating thereto. To the extent the Liquidating Trustee and Reorganized Debtor are unable to agree on any decision relating to the operation of the Liquidating Trust or administration of the Sargent Ranch Property, the Trustee shall be permitted to request, via letter to the Bankruptcy Court, that such dispute be resolved by the Bankruptcy Court either by telephonic conference, hearing or any other means directed by the Bankruptcy Court.

### 3.     Limitation of Liability

In exercising the rights and duties set forth herein, the Liquidating Trustee shall exercise its best judgment, to the end that the affairs of the Liquidating Trust shall be properly managed and the interests of

all the Beneficiaries are safeguarded; but no Trustee shall incur any responsibility or liability by reason of any error of law or of any matter or thing done or suffered or omitted to be done under the Liquidating Trust, except for breaches of fiduciary duty and willful misconduct of such Liquidating Trustee. No claim or cause of action shall lie against any Trustee for any action or lack of action taken by such Liquidating Trustee in reasonable reliance upon the advice of any attorney or other professional engaged or consulted with.

## VIII. CERTAIN FACTORS TO BE CONSIDERED

The holder of a Claim against the Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

A.    **Certain Bankruptcy Considerations**

The Debtor believes that if the Plan is not confirmed and consummated, there can be no assurance that any alternative plan of reorganization would be on terms as favorable to the holders of the impaired Claims as the terms of the Plan. In addition, if a protracted reorganization or a liquidation of the Debtor's assets were to occur, there is a substantial risk that holders of Claims would receive less than they will receive under the Plan. See *Exhibit 2* for a liquidation analysis of the Debtor.

The Plan substantially relies on the continued operation of the Reorganized Debtor. After the Effective Date, Wayne F. Pierce will continue as the Managing Member of the Debtor and he will be assisted by Watley in all aspects of the Debtor's operations. Attached hereto as Exhibit 3 is an operating proforma for the 60 months period after the Effective Date under their direction. The continued successful operations of the Reorganized Debtor relies heavily on obtaining Priming Financing, which the Debtor is finalizing and will file a motion to approve. The operating proforma was developed by Mr. Pierce and Watley based upon their expertise and upon the available input from experts in the fields necessary to develop the Debtor's

60

business opportunities. Assumptions were made in preparing the projections. The projections have not been audited. It should be noted that Watley was never a holder of any equity interests in the Debtor.

**B.**  **Tax Consequences**

THE FEDERAL, STATE, LOCAL AND OTHER GENERAL TAX CONSEQUENCES TO THE HOLDERS OF CLAIMS AND INTEREST AS A RESULT OF THE PLAN MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. THEREFORE, EACH CREDITOR OR EQUITY SECURITY HOLDER SHOULD CONSULT THEIR OWN TAX ADVISOR TO DETERMINE THE TREATMENT AFFORDED THEIR RESPECTIVE CLAIMS OR INTERESTS BY THE PLAN UNDER FEDERAL TAX LAW, THE TAX LAW OF THE VARIOUS STATES AND LOCAL JURISDICTIONS OF THE UNITED STATES AND THE LAWS OF FOREIGN JURISDICTIONS.

NO STATEMENT IN THIS DISCLOSURE STATEMENT SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE. THE DEBTOR AND ITS COUNSEL DO NOT ASSUME ANY RESPONSIBILITY OR LIABILITY FOR THE TAX CONSEQUENCES A CREDITOR OR EQUITY SECURITY HOLDER MAY INCUR AS A RESULT OF THE TREATMENT AFFORDED THEIR CLAIM OR INTEREST UNDER THE PLAN.

### IX. CONFIRMATION AND CONSUMMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

**A.**  **Solicitation of Votes**

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims in Classes 1, 2, 3, 4, 6, 7 and 8 are impaired and are entitled to vote to accept or reject the Plan. Any Creditor holding a Claim in an impaired class under the Plan (other than those Classes deemed to have rejected the Plan) may vote on the Plan so long as such Claim has not been disallowed and is not the subject of an objection pending as of the voting deadline. Nevertheless, if a Claim is the subject of such an objection, the holder thereof may vote if, prior to the voting deadline such holder obtains an order of the Bankruptcy Court allowing such Claim, in whole or in part, or the Bankruptcy Court approves a stipulation between the Debtor and such holder, fully or partially allowing such Claim, whether for all purposes or for voting purposes only

The holders of Class 9 Claims, if any, will receive no distribution on account of their Claims. In accordance with section 1126(g) of the Bankruptcy Code, the holders of such Equity Interest Claims are conclusively presumed to reject the Plan and the votes of such holders will not be solicited with respect to such Claims.

As to classes of claims entitled to vote on a plan, the Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class that have timely voted to accept or reject a plan.

**A BALLOT WILL NOT BE COUNTED IF IT IS NOT *ACTUALLY RECEIVED* BY JOHN L. SMAHA, ESQ., SMAHA LAW GROUP, 7860 MISSION CENTER COURT, STE. 100, SAN DIEGO, CA, 92108, NO LATER THAN 4:00 P.M., PACIFIC TIME, ON _____ PLEASE FOLLOW THE INSTRUCTIONS ON YOUR BALLOT FOR RETURNING THE BALLOT.**

In addition, a vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If you have any questions about these instructions, please call John L. Smaha, Esq., at (619) 688-1557.

**B.    The Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Confirmation Hearing in respect of the Plan has been scheduled for _____, Pacific Time, before the Honorable Peter W. Bowie, United States Bankruptcy Court, Southern District of California. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

Objections, if any, to confirmation of the Plan must be in writing, and must (a) state the name and address of the objecting party and the nature and amount of the claim or interest of such party, (b) state with particularity the basis and nature of each objection to confirmation of the Plan, and (c) be filed, together with proof of service, with the Court (with a copy to chambers) and served so that they are received no later than 4:00 p.m., Pacific Time, on _____, by the Court and the following parties: (i) John L. Smaha, Esq., Smaha Law Group, 7860 Mission Center Court, Ste. 100, San Diego, CA, 92108; (ii) Office of the United States Trustee, 402 West Broadway, Ste. 600, San Diego, CA 92101-8511, Attention: David Ortiz.

Any party failing to file and serve an Objection to the Plan in compliance with this Order shall be barred from being heard upon or raising any objections to the Plan at the Confirmation Hearing.

## C.    **Confirmation**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of the Plan are that the Plan is (i) accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the Plan "does not discriminate unfairly"and is "fair and equitable" as to such class, (ii) feasible, (iii) in the "best interests" of creditors and stockholders that are impaired under the Plan, and (iv) complies with section 1129(a)(9)(C)of the Bankruptcy Code.

### 1.    **Cramdown - Unfair Discrimination and Fair and Equitable Tests**

To obtain non-consensual confirmation of the Plan, at least one impaired class must vote to accept the Plan (excluding any votes of insiders), and the Debtor must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting class. The Bankruptcy Code provides the following non-exclusive definition of the phrase "fair and equitable," as it applies to secured creditors, unsecured creditors and equity holders:

      **a.**     **Secured Creditors.** Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a value as of the Effective Date of the Plan equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens attaching to the proceeds of the sale and the treatment of such liens on proceeds is provided in clause (i) or (ii) immediately above.

      **b.**     **Unsecured Creditors.** Either (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the allowed amount of its claim, or (ii) the holders of claims and interests that are junior to the claims of the rejecting class of unsecured creditors will not receive or retain any property under the Plan.

      **c.**     **Equity Interests.** Either (i) each impaired holder of an equity interest receives or retains under the Plan on account of such interest, property of a value, as of the Effective Date of the Plan, equal to the greater of (A) the allowed amount of any fixed liquidation preference to which such holder is entitled, (B) any fixed redemption price to which such holder is entitled or (C) the value of such interest, or (ii) the holders of any equity interests that are junior to the interests of the rejecting class of equity holders will not receive or retain any property under the Plan.

      The Debtor believes that the Plan and the treatment of all classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan. In the event that one or more classes of impaired Claims or Equity Interests reject the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired class of Claims or Equity Interests.

      **2.**     **Feasibility**

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. The Debtor believes that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

### 3.    Best Interests of Creditors Test

With respect to each impaired class of Claims and Equity Interests, confirmation of the Plan requires that each holder of a Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests of creditors test."  To determine what holders of Claims and Equity Interests of each impaired class would receive if the Debtor were liquidated under chapter 7, the Bankruptcy Court determines the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation case. The cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the assets of the Debtor, augmented by the unencumbered cash held by the Debtor at the time of the commencement of the liquidation case. Such amounts would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from the termination of the Debtor's business and the use of chapter 7 for the purposes of liquidation.

Attached as Exhibit 2 is a Liquidation Analysis, consisting of a pro forma liquidation balance sheet. The Liquidation Analysis reflects the Debtor's assumptions of the amount and sources of cash that would be available for distribution if the Debtor were to be wound down and liquidated in a chapter 7 proceeding. Under that scenario, the basic sources of cash include cash on hand, the collection of the Debtor's remaining receivables (including tax refunds and litigation proceeds discussed above), the estimated proceeds obtained from the sale of the Debtor's remaining furniture and equipment, and proceeds estimated to be achievable from the pursuit of Avoidance Actions.  The aggregate amount of those proceeds would be distributed

according to the priority scheme established by chapter 7 of the Bankruptcy Code. The first priority distribution would include the percentage fees payable to a chapter 7 trustee (computed on a sliding scale as a percentage of the gross proceeds distributed) and the professional fees that a chapter 7 trustee would likely incur. The Debtor estimates such fees and professional costs at approximately $125,000.00. Thereafter, the Administrative Claims incurred by the estate during the pendency of the chapter 11 case of the Debtor would be paid. In the attached Liquidation Analysis, the Debtor assumes that these claims (estimated to be $425,000.00) will be paid in full.

As demonstrated by the Liquidation Analysis, once the administrative fees and expenses of the chapter 7 proceeding and Chapter 11 proceeding are paid, the remaining net proceeds would be paid to holders of pre-petition Priority Claims, and then to unsecured creditors.

In this analysis all secured creditors, to the extent of their security, all priority claims, and claims of administration would receive no distributions. Likewise, holders of unsecured claims would receive no distribution.

As discussed above, the Debtor believes that the Plan will provide for the payment of all Administrative Claims, Fee Claims, Priority Tax Claims, Priority Claims and General Unsecured Claims in full. Accordingly, the Debtor believes that confirmation of the Plan will provide each holder of an Allowed Claim a recovery that is not less than such holder would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code Reference should be made to the Liquidation Analysis for a complete discussion and presentation of the expected distributions to parties in interest if the Reorganization Case were converted to a case under chapter 7 of the Bankruptcy Code.

## X. ALTERNATIVES TO CONFIRMATION AND
## CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the Debtor's alternatives include (i) liquidation of the Debtor under chapter 7 of the Bankruptcy Code and (ii) the preparation and presentation of an alternative

plan of reorganization, however, as of the date hereof no alternate Plan has been filed.  In addition thereto the timing of confirmation of the Plan is an important factor.  Currently various of the Debtor's business opportunities require the influx of funds and the obtaining of various permits.  Thus a failure to confirm this Plan could result in the Debtor's future operations being impaired. CREDITORS ARE THEREFORE URGED TO VOTE IN FAVOR OF THE DEBTOR'S PLAN.

A.    **Liquidation under Chapter 7**

If no chapter 11 plan can be confirmed, the Reorganization Case may be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtor. A discussion of the effect that a liquidation would have on the recovery of holders of Claims is set forth above, and illustrated in the Liquidation Analysis attached hereto as Exhibit 2.

## XI. CONCLUSION AND RECOMMENDATION

The Debtor urges holders of impaired Claims to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received on or before 4:00 p.m., Pacific Time on

_____.

Dated: ~~October 11~~November 8, 2010          Respectfully submitted,

      /s/  John L. Smaha
John L. Smaha, Bar No. 095855
SMAHA LAW GROUP, APC
7860 Mission Center Ct., Ste. 100
San Diego, CA 92108
T: (619) 688-1557
F: (619) 688-1558
*Attorneys for Sargent Ranch, LLC*

W:\Sargent Ranch\Plan and D.S\101.Disclosure.Statement.11-8-10 (Redlined).wpd

WordPerfect Document Compare Summary

Original document:  W:\Sargent Ranch\Plan and D.S\101.Disclosure.Statement.10-4-10.wpd
Revised document:  @PFDesktop\:MyComputer\W:\Sargent Ranch\Plan and
D.S\101.Disclosure.Statement.11-8-10.wpd
Deletions are shown with the following attributes and color:
    ~~Strikeout~~, Blue  RGB(0,0,255).
    Deleted text is shown as full text.
Insertions are shown with the following attributes and color:
    <u>Double Underline</u>, Redline, Red  RGB(255,0,0).

The document was marked with 31 Deletions, 42 Insertions, 0 Moves.