1  JOHN L. MORRELL, ESQ. (Bar No. 116879)
   morrell@higgslaw.com
2  PAUL J. LEEDS, ESQ. (Bar No. 214309)
   leedsp@higgslaw.com
3  VICTORIA E. FULLER, ESQ. (Bar No. 216494)
   fullerv@higgslaw.com
4  HIGGS FLETCHER & MACK LLP
   401 West "A" Street, Suite 2600
5  San Diego, CA  92101-7913
   TEL:  619.236.1551
6  FAX:  619.696.1410

7  Attorneys for Trustee
   DOUGLAS WILSON

8

9              **UNITED STATES BANKRUPTCY COURT**

10             **SOUTHERN DISTRICT OF CALIFORNIA**

11                              CASE NO. 10-00046-PB

12  In re SARGENT RANCH, LLC,     **MOTION TO APPROVE POST-PETITION
                                  FINANCING;  MEMORANDUM OF
13         Debtor.                POINTS AND AUTHORITIES IN
                                  SUPPORT**

14
                                  DATE:    APRIL 12, 2011
15                                TIME:    3:00 P.M.
                                  DEPT:    4
16                                ROOM:    328
                                  JUDGE:   HON. PETER W. BOWIE
17

18         DOUGLAS WILSON, the Trustee ("Trustee") in this Chapter 11 bankruptcy brought by

19  the debtor, SARGENT RANCH, LLC ("Sargent Ranch"), hereby moves this Court for an Order

20  approving post-petition financing pursuant to 11 U.S.C. section 364 and Bankruptcy Rule 4001,

21  and submits his Memorandum of Points and Authorities in support.

22                                    I.

23                                  FACTS

24  A.     **Introduction.**

25         Sargent Ranch owns 6,400 acres of real property in Gilroy, California, and approximately

26  $5.00 in cash.  According to various estimates and appraisals produced in connection with this

27  case, the property is worth between $9 million and $700 million.

28  ///

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1003521.1

CASE NO. 10-00046-PB
P&A SUPPORTING MOTION FOR APPROVAL
OF POST-PETITION FINANCING

1    There are significant secured claims against the property, and vastly different contentions

2    regarding the amounts of those secured claims.  Proofs of claim have been filed that total over

3    $160 million.  During the Chapter 11 process, the Debtor has raised credible concerns regarding

4    the funding of certain portions of these claims, and whether the Debtor ever received substantial

5    portions of the funds.  Efforts to resolve these funding issues have been thwarted by the apparent

6    destruction of records once held by the mortgage broker that (improperly) syndicated the loans

7    secured by the deeds of trust, and the fact that the debtor apparently has no bank records, at all.

8    Finally, due to the lack of management mechanisms for the loans themselves, there is a

9    deadlock of control among various interest holders in the first, second, and third trust deeds- some

10    of whom own significant interests in each of the levels of debt- resulting in disagreement and

11    distrust over the decisions with regard to the loans, and allegations of conflicts of interest.  In

12    short, there is no single party with decision-making authority that could authorize the

13    employment of non-bankruptcy remedies for the benefit of the beneficiaries of the deeds of trust.

14    If the case were not in bankruptcy, it is extremely likely that another court would be required to

15    make the governance decisions required for the exercise of non-bankruptcy remedies, a process

16    that would require years of litigation and potentially hundreds of thousands of dollars of legal

17    expenses.  Given that a large number of the beneficiaries of the deeds of trust are retired and need

18    to access their funds, such delay and expense is unacceptable.

19    In short, the Trustee is tasked with evaluating the real worth of the Sargent Ranch

20    property, *which is entirely dependent on the intended use of the property*, as evidenced by the

21    widely divergent values cited to date.  The only process to ensure that the property is dedicated to

22    its highest attainable value for the benefit of all legitimate interest-holders, and to achieve a

23    global and binding resolution to the varied interests of the same parties, is the proposal and

24    confirmation of a plan of reorganization.

25    In accordance with Bankruptcy Code section 364(d), the Trustee therefore requests the

26    Court to approve a priming loan in the amount of $809,140 to pay for the process of plan proposal

27    and confirmation.  As the Trustee's budget shows, this fund will enable the Trustee to evaluate

28    and maximize the real value of the property, evaluate the legitimate claims of creditors, propose a

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1003521.1

2

CASE NO. 10-00046-PB
P&A SUPPORTING MOTION FOR APPROVAL
OF POST-PETITION FINANCING

1  feasible plan, and break the deadlock that has prevented the payment of the Debtor's creditors for

2  over six years.

3  **B.    Statement of Relief Requested (FRBP 4001)**

4  The full terms of the proposed priming loan are set forth in the Letter of Intent that is

5  attached as Exhibit "A" to the Declaration of Douglas Wilson filed concurrently herewith.  The

6  general terms of the loan are the following:

| | |
|---|---|
| Lender: | Enderley, LLC |
| Loan amount: | $808,140.00 |
| Interest rate: | 11% [1] |
| Points: | 3 |
| Term: | 12 months ; 18 months if extended |
| Collateral: | 14 Parcels in Santa Clara County: APN 810-37-006, -007, -008; 810-38-002, -009, -014, -015, -016, -017; 841-36-013; and Santa Cruz County: APN 110-201-04; 110-251-06; 110-271-01; 110-281-01. |
| Priority: | Superpriority, priming all existing liens, including tax liens. |

17  Again, the loan proceeds will be used to propose the plan of reorganization that will

18  require the Reorganized Debtor to entitle and develop the Santa Springs property as a sand

19  quarry, and to develop and sell certain excess mitigation credits. Plowden Decl., ¶ 3; Declaration

20  of Verne Freeman, attached as Ex. B to the accompanying Request for Judicial Notice.  If the

21  loan were repaid in 12 months, presumably by replacement financing in conjunction with the plan

22  of reorganization, the total cost of funds would be $133,139.56, or approximately 16.4% of the

23  loan amount.

24  **C.    The Property Valuation Spread**

25  Debtor's statements and schedules initially valued the Sargent Ranch Property at

---

[1]    Note that the loan transaction is exempt from the usury provisions of the California Constitution because:  (1) the loan is for more than $300,000, and is guaranteed by an entity rather than an individual; and (2) Sargent Ranch has total assets that exceed $2 million.  Cal. Corp. Code, §§ 25118(a), (f).

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1003521.1                3                CASE NO. 10-00046-PB
P&A SUPPORTING MOTION FOR APPROVAL
OF POST-PETITION FINANCING

1   $716,100,000, assigning the highest possible value to each of the 14 parcels included in the

2   Sargent Ranch property (the "Property"). The Debtor's values are dependent upon the dedicated

3   use of the property for specified purposes. Some of these values are supported, at least in part, by

4   the expert opinions offered in the Debtor's Disclosure Statement.

5       The Declaration of Vern Freeman dated October 14, 2010, filed in support of Debtor's

6   Disclosure Statement as Exhibit 10, opined that the value of a specific 100 acre parcel of the

7   Property was $73.4 million, with a cost to entitle and license the parcel as a quarry at $4.1

8   million. Request for Judicial Notice ("RJN") Exhibit "A." Mr. Freeman is an experienced quarry

9   developer and operator, and the Trustee has concluded that Mr. Freeman's valuation is reasonable

10  and factually based. See Declaration of Terry Plowden filed concurrently with this Motion

11  ("Plowden Dec.") at paragraph 7. The Declaration of Rick Hopkins, a conservation biologist

12  with substantial experience developing mitigation programs, has concluded that the Property

13  includes 377 excess mitigation credits that could be developed and sold for $23,646,000 between

14  2011 and 2017. See RJN Exhibit B (Exhibit 13 to Debtor's Disclosure Statement). The Trustee

15  has assessed these claims and believes that they are also realistic. Plowden Dec. at Para. 8.

16      In contrast, employment of the Property as a ranch results in a substantially lower value.

17  For example, the Declaration of Anthony Brigantino filed in Support of the Motion for Relief

18  from Stay DWG-1, filed by creditor Norman Adams et al, opined that the Property was worth

19  $9.3 million. See Docket No. 175-4. The supporting appraisal and comparable properties assume

20  that the Property will be used for cattle grazing, only. See RJN Exhibit C; Docket No. 175-5.

21      It is clear from these examples, among others, that the value of the Property depends

22  entirely on the intended use. The Property has unique attributes that, if developed, produce

23  values many times the value "as is-" that is, as ranchland. Given that there are potentially $160

24  million in claims against the Debtor's Estate, and that there is significant value to be recognized

25  through the development of certain uses of the Property, the Trustee has a duty to propose a plan

26  that will maximize this value for the benefit of all interested parties.

27  ///

28  ///

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1003521.1

4

CASE NO. 10-00046-PB
P&A SUPPORTING MOTION FOR APPROVAL
OF POST-PETITION FINANCING

**D.    The Secured Claims**

Deeds of Trust.  The Property is encumbered by three deeds of trust, recorded as follows:

| | |
|---|---|
| First Deed of Trust (June 2000) | $15,000,000.00 |
| Second Deed of Trust (Nov. 2000) | $15,000,000.00 |
| Amendment to First Deed of Trust (Nov. 2000) | $10,000,000.00 |
| Third Deed of Trust (Oct. 2003) | $3,000,000.00 |
| Total Principal | $43,000,000.00 |

According to Debtor's disclosure statement, the loan broker, First Blackhawk Financial, also arranged additional "protective advances" in the amount of $47,846,532.00, but disputes that these amounts were paid at the direction of the Debtor, and  that the amounts were paid for the Debtor's benefit.

Potential tax liens.   The Trustee does not yet have complete information on other encumbrances; however, the Trustee is aware that property taxes have not been paid on any of the parcels for approximately three years.  The Debtor's Financing Motion filed 10/15/2010 indicated that approximately $750,000 would be budgeted for the payment of property taxes in conjunction with a plan of reorganization.  There are approximately $65,000 in property taxes owing that have been outstanding for more than 60 months, and are therefore eligible to be foreclosed under California law.  The Trustee has communicated with the office of the tax assessor in Santa Clara County, however, and it does not appear that there is imminent danger of a tax sale of the Property.  Further, any such sale could only be conducted after obtaining relief from stay, and no taxing authority has sought such relief.  Through this motion, Trustee seeks funds sufficient to cure any delinquent property taxes that could become the basis of a tax sale- specifically those property taxes that have not been paid for 60 months.  The balance will receive the treatment required for such claims pursuant to a confirmed plan.

Other than the deeds of trust and potential tax liens, the Trustee is not aware of any other claims secured by the Property.

**E.    The Deadlock**

During January 2011, the Trustee and his counsel met with a large number of the active

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1003521.1

5

CASE NO. 10-00046-PB
P&A SUPPORTING MOTION FOR APPROVAL
OF POST-PETITION FINANCING

1    secured creditors in this matter and/or their counsel. From these meetings, the Trustee

2    determined that there is substantial disagreement among the secured creditors about how to

3    proceed. Some favored foreclosure, but noted that the fractional interest holders could not reach a

4    decision regarding foreclosure. Holders of interests in the third trust deed sought relief from stay

5    to foreclose, but conceded that they would bee "out of the money" with regard to the value of the

6    Property as it is currently used. See Motion for Relief from Stay DWG-1, filed by creditor

7    Norman Adams et al; Docket No. 175-1. Others hold interests in multiple trust deeds- that is,

8    they might have an interest in the first but also have an equally large interest in the second. For

9    this reason, they favored action that would not harm the junior liens. Other creditors have opined

10    that those with interests in multiple deeds of trust have a conflict of interest and cannot be

11    allowed to control the matter.

12         As discussed more thoroughly below, the plan process itself will adequately protect the

13    interests of the secured creditors. As it currently stands, their collateral is worth $9.3 million.

14    Developed, the property will likely generate revenue supporting a value of over $93 million.

15    Only a plan can bind the parties and dedicate the Property to uses that will maximize the value for

16    all. As such, the plan process itself will adequately protect them, because it will enhance the

17    value of the collateral by many multiples of the requested loan.

18    **F.    The Increase In Value Generated By Development of the Land As a Sand Quarry and By Selling the Environmental Credits.**

19

20         As set forth above, the Trustee's plan of reorganization will focus on (1) the development

21    and sale or operation f a sand quarry, and (2) the development and marketing or sale of mitigation

22    credits. The Trustee estimates that these two steps alone will increase the value of the Estate by

23    at least $93 million.

24         The parcel known as the "Santa Springs" property contains a sand deposit of

25    approximately 25 million tons. Declaration of Terry Plowden ("Plowden Decl."), ¶ 7. There is

26    an 80%-plus chance of obtaining permits to operate a 25-million-ton sand quarry on the property

27    within 18 to 24 months. *Id.* Once the sand quarry is developed, it will generate annual operating

28    cash flow in the following amounts: $5.4 million after the first year of operations, $10.5 million

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1003521.1

6

CASE NO. 10-00046-PB
P&A SUPPORTING MOTION FOR APPROVAL
OF POST-PETITION FINANCING

after the second year, $16.1 million after the third year, and $35.5 million after years four through ten. *Id.* Moreover, a sale of the developed and operating sand quarry will yield more than $70 million. *Id.* The Trustee believes that this parcel can be either (10 developed and sold, or (2) operated by the Reorganized Debtor to create a fund to repay its creditors.

The environmental credits also represent substantial value. Sargent Ranch may reasonably sell approximately 377 environmental credits over the next six years, without compromising any plans for developing the property, and, in doing so, generate total revenues of $23,646,000. Plowden Decl, ¶ 8. The Trustee believes that these credits should be developed and sold for the benefit of the Estate's creditors. In combination with the sand quarry, the sale of these credits pursuant to a plan will likely generate revenue of $93 million for the Estate.

In order to dedicate the Property to these uses, a plan of reorganization must be proposed and confirmed. Based upon his discussions with the various interest holders, the trustee is confident that a feasible, and possibly consensual, plan can be reached. The plan itself is the mechanism to ensure that the reorganized Debtor will dedicate its Property to the repayment of its creditors, and through which the legitimacy of the creditors' claims will be resolved.

**G.    The Appointment of the Trustee**

On October 15, 1020, secured creditor Energy research Generation, Inc. Retirement Trust ("ERG") filed a motion for appointment of a Chapter 11 Trustee. The motion was served on all parties; no secured creditor objected to the appointment  of  the trustee.  The Trustee was appointed on January 11, 2011.

**H.    Use of Funds**

The Trustee has proposed a budget for the use of the loan proceeds, which is attached as Exhibit "A" to the Declaration of Douglas Wilson filed in support. The budget is focused and tailored on the realistic expenses to confirm a plan of reorganization.  These include the accounting expenses associated with a forensic examination of the claims and projections for the plan funding and payments ($140,000), legal fees for the determination of claims, plan preparation and confirmation process, and case administration ($250,000), estimated consultant fees for the confirmation of value for the sand quarry and mitigation credits ($145,000), and

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1003521.1

7

CASE NO. 10-00046-PB
P&A SUPPORTING MOTION FOR APPROVAL
OF POST-PETITION FINANCING

1  operating expenses, including insurance and potential tax payments that may need to be made to

2  preserve the Property during the plan confirmation period ($85,000).    There is a contingency

3  amount of $55,000 included, for a total funded loan balance of $675,000.

**II.**

**ARGUMENT**

6      According to Bankruptcy Code section 364(d), the Court may authorize a trustee to obtain

7  credit secured by a senior lien on property of the estate, if: the debtor-in-possession is unable to

8  otherwise obtain credit; and the interests of the lien-holders on the property are adequately

9  protected.  11 U.S.C. § 364(d).  As explained below, the Court should authorize the loan sought

10  here because Sargent Ranch is unable to obtain credit by other means, and because the existing

11  secured creditors are adequately protected.

12  **A.    Sargent Ranch Is Unable to Obtain Credit By Other Means**

13      Jay Gangwal, the Director of Acquisitions at Douglas Wilson Company, sought to obtain

14  financing to develop the sand quarry from many different lenders.  Gangwal Decl., ¶¶ 2-4.  He

15  ultimately sent requests for terms to five different lenders, and specifically requested unsecured

16  financing.  *Id.,* at ¶¶ 4-5.  But every lender made it clear that they would insist in a superpriority

17  lien, and that they would not offer a loan without such a lien.  *Id.,* at ¶ 5.  As a result, Sargent

18  Ranch us not able to obtain credit by any means other than the superpriority loan requested here.

19  **B.    The Existing Secured Creditors Are Adequately Protected.**

20      While the term "adequate protection" is not defined in the Bankruptcy Code, section 361

21  sets forth three non-exclusive examples of circumstances that constitute adequate protection:

22  (1) periodic cash payments that are equivalent to any decrease in property value; (2) an additional

23  or replacement lien on the property; and (3) other relief that provides the indubitable equivalent of

24  the entity's interest in the property.  *In re Mellor,* 734 F.2d 1396, 1400 (9th Cir. 1984).

25      An "equity cushion" is well-recognized as the classic form of adequate protection for a

26  secured creditor.  An equity cushion is the value of the property, above the amount owed to a

27  secured creditor, that will shield that interest from loss caused by any decrease in value.  *In re*

28  *Mellor,* 734 F.2d at 1400.  As the Ninth Circuit explained nearly two decades ago:

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1003521.1

8

CASE NO. 10-00046-PB
P&A SUPPORTING MOTION FOR APPROVAL
OF POST-PETITION FINANCING

> "Although the existence of an equity cushion as a method of adequate protection is not specifically mentioned in § 361, it is the classic form of protection for a secured debt justifying the restraint of lien enforcement by a bankruptcy court. In fact, it has been held that the existence of an equity cushion, standing alone, can provide adequate protection." *Id.*

Courts have noted that the legislature expressly intended to give the courts great flexibility in formulating methods of protection appropriate to the circumstances of each case. H. Rep. No. 95-595, 95th Cong., 1st Sess. (1977) 338-340. *In re Crockett*, 3 B.R. 365, 368 (Bankr. N.D. Ill. 1980). Further, the realization of the "indubitable equivalent" by a secured creditor has been interpreted to mean "equivalence" at the time of reorganization, rather than immediately. The Supreme Court has explained: "It is obvious (since §§ 361 and 362(d)(1) do not entitle the secured creditor to immediate payment of the principal of his collateral) that this "realization" is to "result" not at once, but only upon completion of the reorganization." *United Sav. Asso v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 377 (U.S. 1988)

In this case, it is virtually undisputed that the collateral is worth substantially more if developed than in its present state as a cattle ranch. Where value is premised upon use, the commitment to a particular use is itself the protection to the holder of the collateral. While there is some risk attendant to every planned development, the groundwork and opinions supporting the potential value of the Sargent Ranch Property after reorganization provide more than adequate basis to find that the secured creditors are adequately protected. Further, the Trustee is seeking to borrow only so much as is required to pay for the confirmation process. Any amounts needed to fund the plan itself would be included in the plan, and may be separately examined during the confirmation process.

The parties have wrangled for more than five years with no resolution, and no agreement as to how to develop the collateral for payment of creditors' claims. As noted above, this appears to have stemmed from the failure to clearly define the parties' rights when the debt instruments were created, and from an inability to obtain funding to develop the property to pay the claims. These problems are ideally suited to resolution through a Chapter 11 plan. The proposal and confirmation of a plan of reorganization requires professionals: specifically, an accountant, land

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1003521.1

9

CASE NO. 10-00046-PB
P&A SUPPORTING MOTION FOR APPROVAL
OF POST-PETITION FINANCING

1   development consultant, and attorneys. As noted above, the purpose of this loan is to propose and

2   confirm a plan, and that process will provide the secured creditors at every level an enhanced

3   prospect of recovery that is far beyond the amount of the proposed loan.

4   **C.     Usury Exceptions**

5          Finally, Trustee and proposed lender seek a determination that the proposed loan complies

6   with California usury restrictions. Under California Corporations Code section 25118, a lender is

7   exempt from usury provisions of the California Constitution (may charge more than 10 percent

8   per annum interest) if the loan is for at least $300,000.00 and not guaranteed by an individual.

9   (Cal. Corp. Code, § 25118, subd. (b).) In the alternative, if the borrower entity has total assets of

10  at least $2,000,000.00, according to its most recent financial statements, the lender is exempt

11  from the applicable usury limits. (Cal. Corp. Code, § 25118, subd. (a).) These usury exemptions

12  are only available if: (1) the lender and borrower have a preexisting personal or business

13  relationship; or (2) the lender and borrower could reasonably be assumed to have the capacity to

14  protect their own interests in connection with the transaction. (Cal. Corp. Code, § 25118, subd.

15  (f). Trustee submits that these requirement are met, and that the proposed loan complies with

16  California law regarding usury, such that the agreed interest rate is legal and enforceable.

17                                         **III.**

18                                    **CONCLUSION**

19         For all of the reasons explained above, the Trustee requests that this Court grant its

20  Motion to Approve Post-Petition Financing.

21

22  DATED:  March 17, 2011                    HIGGS FLETCHER & MACK LLP

23

24                                           By:_____
                                                JOHN L. MORRELL, ESQ.
25                                              PAUL J. LEEDS, ESQ.
                                                VICTORIA E. FULLER, ESQ.
26                                              Attorneys for Trustee
                                                DOUGLAS WILSON
27

28

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1003521.1                          10              CASE NO. 10-00046-PB
                                                   P&A SUPPORTING MOTION FOR APPROVAL
                                                   OF POST-PETITION FINANCING